146 Ariz. 284

**The PEOPLE of the State of Colorado, Petitioner,**

v.

**Joseph P. MEDINA, III, Respondent,**

**Colorado Department of Institutions, Intervenor.**

**Nos. 83SC7, 83SC12.**

Supreme Court of Colorado, En Banc.

Sept. 9, 1985.

Stephen H. Kaplan, City Atty., Morris P. Evans, Asst. City Atty., Denver, for petitioner.

Frank P. Slaninger, Denver, for respondent.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., M. Tracy James, Carolyn Lievers, Asst. Attys. Gen., Denver, for intervenor, Colorado Dept. of Institutions.

QUINN, Chief Justice.

■ We granted certiorari to review the decision of the court of appeals in *People in the Interest of Medina*, 662 P.2d 184 (Colo.App.1982), relating to the right of an involuntarily committed and incompetent mental patient to refuse the administration of antipsychotic medicine by attending physicians. The Denver probate court entered an order granting the petition of two psychiatrists to administer antipsychotic medication to the patient in spite of the patient's objection to the medication. The court of appeals reversed the order of the probate court. It held that, in the absence of an emergency requiring immediate action, antipsychotic medicine may not be administered to a nonconsenting mentally ill patient who is incapable of making an informed decision on the proposed treatment unless a court order is obtained authorizing the treatment. In remanding the case for further proceedings, the court of appeals ordered the probate court to consider and make specific findings on the patient's interests, preferences, and a variety of other factors, and to authorize the administration of antipsychotic medication only if there existed state interests of sufficient magnitude to override the absence of consent. 662 P.2d at 188. We conclude that, unless there is an emergency that poses an immediate and substantial threat to the life or safety of the patient or others in the institution, antipsychotic medicine may be administered to a nonconsenting mentally ill patient incapable of making an informed treatment decision only after the trial court conducts a full and fair adversary hearing on the treatment decision and is satisfied by clear and convincing evidence that: (1) the patient is incompetent to effectively participate in the treatment decision; (2) treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient causing serious harm to himself or others in the institution; (3) a

less intrusive treatment alternative is not available; and (4) the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment. Although the standards which we adopt herein are substantially different from those set forth by the court of appeals, we affirm that part of the judgment remanding the case to the probate court for further proceedings.

## I.

The respondent, Joseph P. Medina, III, a thirty-four year old with a long history of mental illness and assaultive behavior, was originally certified for short-term mental health care and treatment on February 27, 1980.[1] On August 27, 1980, pursuant to court order, the respondent was placed by the Department of Institutions in Fort Logan Mental Health Center for long-term care and treatment.

On July 8, 1981, the Denver City Attorney's Office, acting at the request of two psychiatrists on the staff at Fort Logan Mental Health Center, filed a motion in the Denver probate court for an order authorizing treatment of the respondent by the use of antipsychotic medication over the respondent's objection. The motion alleged that the treating psychiatrist had determined that antipsychotic medication would be beneficial to the respondent but that the respondent had been refusing the medication over a number of days. Documents filed in support of the motion indicated that the respondent had a history of violent behavior both inside and outside the mental health facility, remained a danger to himself and others, and was becoming increasingly psychotic and agitated owing to his unmedicated state.

The probate court mailed a copy of the motion to the respondent's attorney, who had represented the respondent at various proceedings since the initial short-term certification, and set the matter for hearing on July 21, 1981. Both the respondent and the respondent's attorney attended the hearing. The evidence elicited at the hearing consisted solely of the testimony of Dr. Kenneth L. Weiner, a psychiatrist who had been treating the respondent at Fort Logan Mental Health Center.

Dr. Weiner testified that the respondent suffered from severe paranoid schizophrenia, which rendered him psychotic most of the time. When in a psychotic state the respondent, according to the doctor, hears voices which cause him inner confusion and anger and generate resulting psychotic fantasies that people are about to hurt him. The respondent sometimes becomes assaultive during these episodes and occasionally attacks others or throws furniture and other objects around the mental health facility. To alleviate these symptoms the psychiatric staff had treated the respondent with antipsychotic medications. Because the respondent initially experienced some muscle rigidity as a side effect of two antipsychotic drugs, haldol and prolixin, his medication was changed to a third antipsychotic compound, thorazine, which was normally administered in three 300 milligram dosages per day. Dr. Weiner stated that the medication enabled the respondent to gain control over some of his paranoia and decreased the incidents of assaultive behavior. In the doctor's opinion, if the respon-

---

**1.** Certification for mental health care and treatment, as provided for in sections 27–10–101 to –129, 11 C.R.S. (1982 & 1984 Supp.), results in the detention in a treatment facility of persons who are mentally ill, and, as a result of such illness, are a danger to themselves or others or who are gravely disabled (*i.e.*, persons who as a result of mental illness are unable to take care of basic personal needs or are making grossly irresponsible decisions concerning their persons and are incapable of realizing they are doing so). Such placement for mental health care and treatment is involuntary, and thus in this opinion when we refer to "involuntary confinement" or "civil commitment," we are alluding to statutory certification procedures. Short-term certification may last for three months, with the possibility of additional three-month extensions, while long-term certification allows the court to order treatment for six months, with further six-month extensions if the requisite conditions of mental illness and dangerousness or grave disability continue to necessitate treatment. *See* sections 27–10–107, –108, and –109, 11 C.R.S. (1982).

dent were to continue regular doses of the medication, he could eventually be placed in a less-restrictive environment, such as a halfway house.

The respondent, however, had told Dr. Weiner that he did not like the effects of the antipsychotic medication and would only intermittently consent to take it. During the two and one-half week period preceding the hearing the respondent had refused six to ten doses of thorazine. As a result of his refusal to take the medication the respondent had become increasingly agitated and angry. Dr. Weiner testified that he was more disturbed by inner voices than previously, suffered severe headaches, was often assaultive, and escaped from the treatment center on one occasion. It was the doctor's opinion that if the respondent continued to refuse antipsychotic medicine, he would never be well enough to leave the facility and would function poorly even in that setting.

Dr. Weiner acknowledged in his testimony that antipsychotic medication, specifically thorazine, produces various side effects, such as sedation, blurred vision, mouth dryness, low blood pressure, urinary retention, and constipation. These adverse reactions, according to the doctor, are generally short-lived and, in the respondent's case, disappeared shortly after their onset. Dr. Weiner stated that the respondent reacted well to a 900–1200 milligram dosage of thorazine per day, a fairly large amount, and that upon his becoming less psychotic this dosage would be reduced to the range of 500–800 milligrams per day.

The more serious risk from antipsychotic medication, according to Dr. Weiner, is tardive dyskinesia. This condition is characterized by involuntary movements of the tongue, lips, and jaw and may ultimately progress to a stage resulting in involuntary movements of the extremities, neck, and back. Tardive dyskinesia, in its extreme form, may interfere with speech, swallowing, and breathing. There is no known method for preventing the occurrence of tardive dyskinesia, and once this condition develops, the ensuing disability may progressively worsen even if the antipsychotic medication is no longer administered. Dr. Weiner stated that the respondent showed no signs at the present of developing this condition. The doctor acknowledged, however, that due to the high degree of medication and the long history of treatment there was a significant risk that the respondent might develop this condition in the not too distant future.

Although the respondent's ability to absorb information was limited to short time frames of thirty seconds to a minute before psychotic thoughts would take over, Dr. Weiner nonetheless attempted on two occasions to explain to him the risks and benefits of the antipsychotic medication. On the first occasion the respondent immediately left the doctor's office, and the second meeting was similarly unsuccessful. It was Dr. Weiner's opinion that the respondent was so mentally impaired that he was unable to make any informed decision on whether it was in his own best interests to take the antipsychotic medication.

At the conclusion of Dr. Weiner's testimony, the probate court offered the respondent's attorney an opportunity to confer with the respondent. The respondent's counsel advised the court that the respondent did not elect to testify in the matter.

The probate court granted the motion for the administration of antipsychotic medicine and entered a written order to that effect on July 24, 1981. In its order the court found in pertinent part as follows: that the respondent was suffering from a serious illness which rendered him incapable of making an informed decision with respect to treatment by antipsychotic medication; that the administration of the medication was in the interest of the respondent's mental health; that the respondent's refusal to take the medication was unreasonable; that the medication "can be properly monitored and controlled" in order to offset the risk of tardive dyskinesia and other side effects; that the risk of tardive dyskinesia was not so great as to prohibit the use of the medication; and that with regular treatment by medication the re-

spondent would probably be capable of living in a less restrictive treatment facility than the Fort Logan Mental Health Center. Based on these findings the court concluded that the physicians attending the respondent should be permitted to administer antipsychotic medications in a manner consistent with sound medical practice, with proper monitoring and control, and for as long a period as the respondent remained under certification for long-term care and treatment.

The court of appeals reversed the order of the probate court. It noted that in *Goedecke v. State Department of Institutions*, 198 Colo. 407, 603 P.2d 123 (1979) (per curiam), this court held that a mental health patient has a common law and statutory right to decline treatment by antipsychotic medication unless a competent tribunal determines that the patient's illness has so impaired his judgment that he is incapable of participating in the treatment decision or that his refusal to submit to treatment is irrational or unreasonable. While recognizing the probate court's determination that the respondent's mental condition rendered him incompetent to effectively participate in the treatment decision, the court of appeals nonetheless recognized a right in the respondent to decline the treatment. Without specifying whether the source of the respondent's right was the federal or state constitution, the common law, or Colorado statutory law, the court of appeals ruled that the respondent's right to decline treatment must be weighed against the state's interest in maintaining order and safety within the institution and in providing effective mental health care to those unable to care for themselves. Proceeding from this analytical framework, the court of appeals went on to hold that, "absent an emergency situation calling for immediate action (in which event the least intrusive means should be used by the physician to meet the emergency), antipsychotic medication shall not be administered to a mentally incompetent institutionalized patient who has not given his consent to this medication unless ordered by a court

following a proper hearing." 662 P.2d at 187.

Addressing the procedural standards required for such a treatment hearing, the court of appeals stated that in the event the mentally ill patient is not present at the hearing or elects not to testify, the trial court must nonetheless talk to the patient, observe his physical and mental condition, and give due consideration to his wishes concerning treatment. In addition to the patient's interests and preferences, the court of appeals listed several other factors to be considered by the trial court, including the following:

the urgency of decision; the extent of impairment of the patient's mental faculties; the patient's level of understanding and probable reaction; the patient's religious beliefs, if any; the clarity of professional opinion as to what is good medical practice; the intrusiveness of the proposed treatment; the complexity, risk, and novelty of the proposed treatment; the prognosis without the proposed treatment; the prognosis with the proposed treatment; the possibility and probability of adverse side effects; whether there is an alternative that is less intrusive than the treatment proposed which would protect the public interest; the impact on the patient's family; the consent or absence of consent of the patient's family or guardian; the good faith of those advocating or objecting to the proposed treatment and the likelihood of conflicting interests; the interests of third persons in and outside of the institution; the risks of physical harm to persons (including the patient, other patients, and institution personnel) or of damage to property in the institution without the proposed treatment; and the effect on the orderly and efficient administration of the institution if the proposed treatment is not given.

662 P.2d at 188. Finally, the court of appeals directed the trial court to make findings on each pertinent factor and to indicate "within each finding those reasons for and against treatment," and then to analyze "the relative weight of the findings" in

the case before it. *Id.* Only if the trial court, after considering all pertinent factors, determines that there exists "a state interest or interests of sufficient magnitude to override the absence of [the patient's] consent" may the court authorize the treatment with antipsychotic medication. *Id.*

We granted certiorari to consider not only whether an institutionalized mentally ill patient who is incompetent to effectively participate in the treatment decision has a right to initially refuse the administration of antipsychotic medicine but also, if such right exists, the source of such right and the appropriate procedures to be followed in determining whether and under what circumstances antipsychotic medicine may be administered over the patient's objection.

II.

The People basically contend that a mentally ill patient who is also incompetent to participate in treatment decisions has no right to refuse treatment through antipsychotic medication and, in the absence of such a right, specific treatment decisions may be entrusted to the judgment of the attending physicians without the need for a court order. In addressing the issue before us, we note at the outset that questions relating to the existence of one's right to refuse treatment and the particular source of that right are inextricably intertwined. If a mentally ill patient who is also incompetent to participate in the treatment decision has a right to refuse antipsychotic medication, it is because the origin of that right is grounded in the federal or state constitution, the common law, or stat-

utory provisions governing commitment procedures for the mentally ill.

■ It is beyond dispute that commitment of a patient to a mental institution in the first instance constitutes a severe infringement on the basic interest of that individual to be free from governmental restraint and thus requires protection under the Due Process Clauses of the United States and Colorado Constitutions. *See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); *People v. Chavez,* 629 P.2d 1040 (Colo.1981); *People v. Taylor,* 618 P.2d 1127 (Colo.1980); *Goedecke v. State Department of Institutions,* 198 Colo. 407, 603 P.2d 123; *People v. Lane,* 196 Colo. 42, 581 P.2d 719 (1978). While constitutional interests envelop the civil commitment process, we need not consider the constitutional aspects of the right of an involuntarily committed and mentally incompetent person to refuse treatment with antipsychotic medication.[2] The reason a constitutional analysis is unnecessary is that both the common law and Colorado's statutory scheme relating to involuntary commitment of the mentally ill clearly contemplate that such persons, whether competent or incompetent to participate in treatment decisions, have the right under appropriate circumstances to legitimately refuse treatment that poses a significant risk to their physical well-being.

**2.** Several courts have alluded to a constitutional basis for an involuntarily committed patient's right to refuse treatment by antipsychotic medication, including the Due Process Clause of the Fourteenth Amendment, *see Bee v. Greaves,* 744 F.2d 1387 (10th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985); *Johnson v. Silvers,* 742 F.2d 823 (4th Cir.1984); *Rogers v. Okin,* 738 F.2d 1 (1st Cir.1984); *Project Release v. Prevost,* 722 F.2d 960 (2d Cir.1983); *Rennie v. Klein,* 720 F.2d 266 (3d Cir.1983); *Stensvad v. Reivitz,* 601 F.Supp. 128 (W.D.Wis. 1985); *Savastano v. Saribeyoglu,* 126 Misc.2d 52,

480 N.Y.S.2d 977 (Sup.Ct.1984); the First Amendment, *see Bee v. Greaves,* 744 F.2d 1387 (10th Cir.1984); *Scott v. Plante,* 532 F.2d 939 (3d Cir.1976); *Winters v. Miller,* 446 F.2d 65 (2d Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); the constitutional right of privacy, *Davis v. Hubbard,* 506 F.Supp. 915 (N.D.Ohio 1980); *In re Guardianship of Roe,* 383 Mass. 415, 421 N.E.2d 40 (1981); *In re K.K.B.,* 609 P.2d 747 (Okla.1980); and the Eighth Amendment prohibition against cruel and unusual punishment, *Scott v. Plante,* 532 F.2d 939 (3rd Cir.1976).

A.

The common law over the centuries has always protected individuals from unwanted intentional contacts with their person. It has been observed that "there is perhaps no right which is older than a person's right to be free from unwarranted personal contact." *Davis v. Hubbard*, 506 F.Supp. 915, 930 (N.D.Ohio 1980). The common law action of battery developed out of the law's recognition of an individual's interest in personal autonomy and bodily integrity—that is, the right of a person to participate in and make decisions about his own body. *Id.* at 931. The law of informed consent emerged from the law of battery, which was applied to unauthorized touchings by a physician. *Mills v. Rogers*, 457 U.S. 291, 295 n. 4, 102 S.Ct. 2442, 2446 n. 4, 73 L.Ed.2d 16 (1982); W. Prosser, *Law of Torts* § 18 at 101 (4th ed. 1971). The rules of informed consent are built on the principle "that only the patient has the right to weigh the risks attending the particular treatment and decide for himself what course of action is best suited for him." *Davis*, 506 F.Supp. at 932. We recognized as much in *Bloskas v. Murray*, 646 P.2d 907, 914 (Colo.1982), when we stated that "[a] physician who operates on a patient's body without the patient's consent, or who performs an operation different from that to which the patient consented, commits a battery and is liable for damages resulting therefrom, notwithstanding the exercise of reasonable care in performing the operative procedure." *See also Maercklein v. Smith*, 129 Colo. 72, 266 P.2d 1095 (1954).

Although the decision to forcibly medicate a patient with antipsychotic drugs undoubtedly involves an aspect of professional medical judgment in connection with psychiatric diagnosis and treatment alternatives, the fact remains that the decision itself directly implicates the patient's legal interests in personal autonomy and bodily integrity. Antipsychotic medications, either alone or in combination, can cause numerous and varied side effects and carry with them the risk of serious and possibly permanent disabilities in the patient. L. Gaughan and L. LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution*, 4 Law and Psychology Rev. 43, 51–56 (1978); Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment*, 72 Nw.U.L.Rev. 461, 474–79 (1977). The effects of these drugs can be far more debilitating to the patient than the physical restraint incident to the involuntary commitment process.[3] Furthermore, "[t]here is

3. Several types of side effects are associated with antipsychotic medications. Autonomic nervous system effects include dryness of the mouth and throat, blurred vision, weight gain, dizziness, fainting, low blood pressure, urinary retention and constipation. A central nervous system effect associated with the medications is sedation, which may cause distress in patients who desire to feel alert and to think clearly. Other effects include adverse behavioral problems, allergic reactions such as jaundice, agranulocytosis (a rarely-occurring serious infection), skin discoloration, eye lesions, endocrine effects such as lactation and impotence, and, on rare occasions, sudden death. The most significant group of side effects, however, is the extrapyramidal effects. These are neuromuscular reactions of three types: parkinsonian syndrome (mask-like face, tremors, drooling, rigidity, shuffling gait, motor retardation, and an "ill-rilling" motion with one or both hands); akathisia (an inability to sit still or an irresistible desire to keep walking or tapping the feet); and dyskinesia (bizarre movements of the tongue, face, and neck). With one exception, all of the common side effects of antipsychotic medications are short-lived, disappear if the dosage is lowered or the type of medication altered, or are treatable through the use of other medications, although these medications have their own associated side effects. The exception is a form of dyskinesia known as tardive dyskinesia. This condition produces involuntary movements of the tongue, lips, and jaw, which may include continual chewing and lip smacking motions and facial contortions. It may also be accompanied by involuntary movement of the fingers, hands, legs, back, neck, and pelvic area. In its most severe form it may interfere with all motor activity, making speech, swallowing, and breathing extremely difficult. Tardive dyskinesia is of special concern for several reasons. First, its symptoms often do not appear until late in the course of treatment and sometimes not until after treatment is discontinued. Second, there is no known cure for the condition. Third, it is impossible to predict who will become a victim, aside from the tendency of the condition to affect patients on long-term high dosages of antipsychotic medications. Finally, the condition is fairly widespread, as studies

virtually no evidence that antipsychotic drugs have a beneficial effect upon patients beyond the time they are in the blood stream." L. Gaughan and L. LaRue, *supra*, at 48.

The significant intrusion on the patient's bodily integrity created by the forced administration of antipsychotic medication provided the doctrinal underpinning for our decision in *Goedecke*, 198 Colo. 407, 603 P.2d 123, that an involuntarily committed mental patient has a qualified common law right to refuse antipsychotic medication and that this right was preserved intact by section 27–10–104, 11 C.R.S. (1982), which expressly provides that a mental health patient, even after certification for mental health care and treatment, does not "forfeit any legal right or suffer legal disability" by reason of the certification. In *Goedecke*, the patient had been certified for short-term care and treatment and had refused the administration of prolixin, an antipsychotic drug that physicians had sought to administer in order to alter the patient's thought patterns and to minimize his dangerousness. Because of the pa-

tient's repeated objections to prolixin medication, the treatment facility petitioned the district court for an order authorizing the administration of the drug over the patient's objections. Notwithstanding evidence that the patient had previously experienced adverse effects from the medication and that prolixin causes "severe side effects in half of the patients treated with it," 198 Colo. at 409, 603 P.2d at 124, the district court granted the order. In reversing, we stated:

> The courts of this state have long acknowledged the physician's obligation to obtain the patient's informed consent not only for surgery, but also for treatment with drugs having possible harmful side effects. As Justice Cardozo declared in *Schloendorff v. Society of New York Hospitals*, 211 N.Y. 125, 105 N.E. 92, 93 (1914), "every human being of adult years and sound mind has a right to determine what shall be done with his own body." The above cited statutory provisions [authorizing involuntary commitment for mental health care and treatment][4] recognize that mental and

have indicated that the condition occurs in 10–40% of patients receiving long-term, high-dosage treatment. Gutheil and Appelbaum, *"Mind Control," "Synthetic Sanity," "Artificial Competence," and Genuine Confusion: Legally Relevant Effects of Antipsychotic Medication,* 12 Hofstra L.Rev. 77, 109 (1983). *See generally Davis v. Hubbard,* 506 F.Supp. 915, 928–29 (N.D.Ohio 1980), and authorities cited therein; H. Kaplan and B. Sadock, *Modern Synopsis of Comprehensive Textbook of Psychiatry/III* 771–89 (3d ed. 1981); *Physicians' Desk Reference* 1896–99 (38th ed. 1984).

4. Colorado's statutory scheme authorizing involuntary commitment for mental health care and treatment reveals a legislative intent to vest an involuntarily committed patient with a qualified right to refuse such treatment. The expressed purposes of the statutory provisions dealing with care and treatment of the mentally ill are listed in section 27–10–101(1), 11 C.R.S. (1982), as follows:

(a) To secure for each person who may be mentally ill such care and treatment as will be suited to the needs of the person and to insure that such care and treatment are skillfully and humanely administered with full respect for the person's dignity and personal integrity;

(b) To deprive a person of his liberty for purposes of treatment or care only when less

restrictive alternatives are unavailable and only when his safety or the safety of others is endangered;

(c) To provide the fullest possible measure of privacy, dignity, and other rights to persons undergoing care and treatment for mental illness;

(d) To encourage the use of voluntary rather than coercive measures to secure treatment and care for mental illness.

As we noted in *Goedecke*, a person certified for mental health care and treatment does not "forfeit any legal right or suffer legal disability" unless specifically and otherwise ordered by the court. § 27–10–104, 11 C.R.S. (1982). Moreover, a person receiving mental health treatment is entitled to such treatment as will "meet his individual needs." § 27–10–116(1)(a), 11 C.R.S. (1982). The Department of Institutions in this respect is required to adopt regulations requiring "[c]onsent for specific therapies and major medical treatment in the nature of surgery." § 27–10–116(2)(a), 11 C.R.S. (1982). The only reasonable interpretation of this statutory scheme is that the legislature quite clearly intended to grant an involuntarily committed patient at least a qualified right to refuse those psychiatric therapies and treatments that create a risk of serious and permanent disabilities for the patient. The administration of antipsy-

emotional illnesses are not crimes and that hospitalization for their treatment is not to be confused with incarceration for punishment. It would be inconsistent with the statutes' spirit and purpose to insist that a patient's common law right to decline medical treatment is abrogated by short-term certification alone. Instead we conclude that this right is to be numbered among those protected by C.R. S.1973, 27–10–104 and is therefore preserved intact in the absence of some finding, reached by a competent tribunal, that the patient's illness has so impaired his judgment that he is incapable of participating in decisions affecting his health.

198 Colo. at 411, 603 P.2d at 125 (footnotes omitted); see also Note, A Common Law Remedy for Forcible Medication of the Institutionalized Mentally Ill, 82 Col.L. Rev. 1720 (1982). Since there was no finding by the trial court that the patient

lacked the capacity to participate in the treatment decision, we had no hesitation in holding that the common law and statutory law of Colorado provided the patient with "a right to withhold consent to the administration of prolixin in non-emergency circumstances." 198 Colo. at 411, 603 P.2d at 125.[5]

### B.

Our decision in *Goedecke* was directed to the right of an involuntarily committed patient who was otherwise competent to participate in the treatment decision to refuse treatment by antipsychotic medication.[6] The instant case raises a question unanswered in *Goedecke*—whether a patient who is not competent to make an informed treatment decision nonetheless possesses the right to object to involuntary treatment by antipsychotic medication. We are satisfied that the qualified right set forth in

chotic medication is within this high risk category of treatment that requires consent or some other legal justification before it may be properly administered to a patient.

**5.** The court in *Goedecke*, after concluding that an involuntarily committed patient had the right to refuse treatment in the absence of a finding that the patient was incapable of participating in the treatment decision, went on to state that "[t]he record in this case contains no finding that [the patient] lacked the capacity to participate in such decisions *or that his refusal to submit to treatment with prolixin was itself irrational or unreasonable.*" 198 Colo. at 411, 603 P.2d at 125 (emphasis added). We interpret the italicized part of this statement as an added requirement that, in the event the patient is incompetent, the court must also find that the patient's refusal was without any reasonable basis in fact before a nonconsensual treatment order may be entered. In part IIIB, *infra*, we spell out the specific elements that enter into this latter determination. If the italicized statement were to be taken to mean that the court might order treatment over a *competent* patient's objection as long as the patient's refusal was unreasonable, then such statement would be irreconcilable with the court's immediately preceding conclusion that the right of refusal is preserved intact by section 27–10–104, 11 C.R.S. (1982), in the absence of an appropriate finding "that the patient's illness has so impaired his judgment that he is incapable of participating in decisions affecting his health." 198 Colo. at 411, 603 P.2d at 125.

**6.** The notion that involuntarily committed patients are, by virtue of the commitment, incompetent to provide informed consent to medical treatment has been rejected. Psychiatric literature rejects any necessary relationship between the establishment of a mental illness and the conclusion that the patient is unable to make rational decisions. H. Davidson, *Forensic Psychiatry* 196 (1952). Competency is a legal, not a medical, decision; "[t]he implicit authority of the psychiatrist should not be the sole justification for violating one's personal integrity." Plotkin, *Limiting the Therapeutic Orgy: Mental Patient's Right to Refuse Treatment*, 72 Nw.U.L. Rev. 461, 489–90 (1977). Furthermore, medical research suggests that there is little justification for ignoring a patient's refusal to submit to antipsychotic medication. As one court has observed, two researchers have found that the patient's "subjective response very early in chlorpromozine [an anti-psychotic] treatment may predict, to a moderate degree, the symptomatic outcome after a sustained course of treatment with the drug." *Davis v. Hubbard*, 506 F.Supp. 915, 936 (N.D.Ohio 1980) (quoting Van Putten & Ray, *Subjective Response as a Predictor of Outcome In Pharmacotherapy*, 35 Arch. Gen. Psychiatry 477, 478–80 (1978)). Finally, because the therapeutic value of antipsychotic medication depends upon the existence of a trusting relationship between the patient and the psychiatrist, the patient's willingness to submit to the medication can only be viewed as a vital component of any effective treatment program. *Davis*, 506 F.Supp. at 936.

*Goedecke* cannot justifiably be limited to those patients who are competent to make treatment decisions. The disruption of bodily integrity is no less real in the case of an incompetent patient; nor, for that matter, are the risks from the antipsychotic medication any less for a patient who is unable to give an informed consent to the proposed treatment. *See In re A.W.*, 637 P.2d 366 (Colo.1981) (the trial court, acting under its probate capacity in determining parents' application for sterilization of mentally retarded minor, must base its decision on an informed estimation of the minor's own interests, because otherwise the mentally retarded minor's inability to make a competent decision would result in the loss of one of her complementary constitutional interests in either procreation or sterilization). If anything, the state has a greater responsibility towards those who are unable to protect themselves and to afford such persons "the same panoply of rights and choices it recognizes in competent persons." *Rogers v. Commissioner of Department of Mental Health*, 390 Mass. 489, 458 N.E.2d 308, 315 (1983), quoting *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417 (1977). The inability competently to choose should not result in the forfeiture of a person's legal rights. We therefore perceive no basis for restricting the right of refusal to those involuntarily committed patients who are themselves competent to understand the significance of the treatment decision.

■ This is not to say, however, that the right of an involuntarily committed and incompetent mental patient to refuse treatment is absolute. The state clearly has a legitimate interest in effectively treating the illnesses of those placed in its charge and, as well, in protecting patients and others from dangerous and potentially destructive conduct within the institution. *See, e.g., Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *Rogers v. Okin*, 634 F.2d 650 (1st Cir.1980), *vacated and remanded sub nom. Mills v. Rogers*, 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982); *Davis*, 506 F.Supp. 915.

The General Assembly implicitly recognized these governmental concerns in enacting section 27–10–111(4.5), 11 C.R.S. (1982), which became effective July 1, 1982, subsequent to the treatment hearing in this case. Section 27–10–111(4.5) states, in pertinent part, that in the event a patient refuses to accept medication the court which originally ordered the patient's certification shall have "jurisdiction and venue to accept a petition by a treating physician and to enter an order requiring that the [patient] accept such treatment, or, in the alternative, that the medication be forcibly administered to him." The statutory grant of jurisdiction and venue, however, is silent on the question of what standards the court should apply in determining whether the legitimate interests of the state should predominate over the interest of the non-consenting patient. The answer to this question necessarily requires the consideration of both sides of the equation within the framework of guidelines that adequately address the incompetent patient's right to refuse an unwanted course of treatment that could result in serious and permanent physical disabilities. We now turn to the formulation of these guidelines.

### III.

■ The People argue that once the patient has been involuntarily committed and found to be incompetent, the patient's right to refuse treatment is adequately protected by the rules and regulations of the institution and the opportunity of the patient to seek post-treatment judicial review of the treatment decision. We find no merit whatever in this argument. Relegating the patient to a post-treatment hearing, in addition to requiring the forfeiture of the patient's interest in bodily integrity as related to the initial treatment, would compel a patient to submit to the very risks to which his refusal was most likely directed in the first instance. Such a remedy hardly comports with the importance that the law has long accorded to a patient's right to participate in treatment decisions affecting his own body.

With this threshold matter aside, we turn to the standards applicable to the treatment hearing in nonemergency situations. We believe these standards will adequately accommodate the respective interest of the patient in matters affecting his body and the interests of the state in providing treatment to mentally ill patients placed in its charge and in safeguarding patients, staff, and others in a mental health facility. We first consider the general procedural protections applicable to a treatment hearing, then the elements that must be established before a court may authorize the administration of antipsychotic medication over the patient's objection, and last the problem of emergency situations requiring immediate treatment.

### A.

■ An involuntarily committed patient is entitled to the benefit of counsel at the treatment hearing. Colorado's statutory scheme relating to certification for short-term and long-term treatment provides indigent mentally ill patients with the right to a court-appointed attorney. §§ 27–10–107(5), 27–10–108, 27–10–109(2), 11 C.R.S. (1982). Furthermore, section 27–10–125(4)(a), 11 C.R.S. (1982), requires the court to appoint an attorney for any non-certified person against whom an order is sought for the imposition of a legal disability or the deprivation of a legal right.[7] It makes no sense to provide the noncertified person with the right to an attorney in such a proceeding but to deny that same right to the involuntarily committed patient at a nonconsensual treatment hearing. In view of a person's basic interest in bodily integrity, we believe that the only fair interpretation of the statutory scheme is that the legislature intended to provide the indigent involuntarily committed patient with the right to court-appointed counsel at any hearing involving the issue of nonconsensual treatment by antipsychotic medication.[8]

■ The burden of proof at the treatment hearing is upon the physician or professional person[9] seeking to administer the treatment to establish the justification for nonconsensual treatment by clear and convincing evidence. Section 27–10–111(11), 11 C.R.S. (1982), requires the clear and convincing standard of proof for certification hearings relating to short-term and long-term care and treatment. Furthermore, section 27–10–125(4)(d), 11 C.R.S. (1982), imposes a similar standard of proof in proceedings for court orders with respect to the imposition of a legal disability or the deprivation of a legal right as to noncertified persons. Although section 27–10–109(4), 11 C.R.S. (1982), which authorizes similar orders in the case of institutionalized patients, is silent on the burden of proof in such proceedings, nothing in the statutory scheme indicates that the legislature intended any standard other than that of clear and convincing evidence to apply to both types of proceedings.

■ At the treatment hearing itself, the patient must be accorded the opportunity to cross-examine adverse witnesses and to

---

**7.** Section 27–10–125, 11 C.R.S. (1982 & 1984 Supp.), provides that "any interested person" may petition the court for "a determination as to the imposition of a legal disability or the deprivation of a legal right" for any person who is not under certification for mental health care and treatment but who is nonetheless mentally ill and dangerous to himself or others, gravely disabled, mentally retarded, developmentally disabled, or insane. The order may affect, for example, the person's contractual rights or the right to operate motor vehicles. As we have indicated, the statute requires that an attorney be appointed for the person potentially subject to the deprivation or imposition, and the need for the order must be demonstrated to the court by clear and convincing evidence.

**8.** Prior to the evidentiary hearing on the treatment decision, the court in its discretion may consider the appointment of a guardian ad litem when the circumstances of the case indicate that a guardian may be of assistance to the patient or the patient's attorney in preparing for and presenting evidence at the treatment hearing.

**9.** Section 27–10–102(10), 11 C.R.S. (1982), defines a "physician" as a person "licensed to practice medicine in this state." A "professional person" includes both a person licensed to practice medicine in Colorado and "a psychologist certified to practice in this state." § 27–10–102(11), 11 C.R.S. (1982).

present evidence in support of any refusal to undergo antipsychotic medication. If the patient is not present at the treatment hearing or elects not to testify, we do not believe that the trial judge, as ordered by the Court of Appeals, must talk with the patient and observe the patient's physical and mental condition. The appointment of counsel for an indigent patient, along with other procedural safeguards outlined herein, will adequately safeguard the interest of the patient at the treatment hearing.[10]

### B.

We turn now to the elements essential to an order for nonconsensual treatment. The opinion of the Court of Appeals would require the trial court to consider and make findings on a myriad of separate factors, to indicate within each finding the reasons for and against treatment, and finally to analyze the relative weight of the findings in arriving at its decision. 662 P.2d at 188. We are satisfied that the interest of both the patient and the state will be adequately served if the physician or professional person desiring to administer antipsychotic medication satisfies the court by clear and convincing evidence of the following four propositions: (1) that the patient is incompetent to effectively participate in the treatment decision; (2) that treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient causing serious harm to himself or others in the institution; (3) that a less intrusive treatment alternative is not available; and (4) that the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.

■ Initially, the party seeking the treatment order must establish the patient's incompetency. As already noted, the fact that the patient has been involuntarily certified for mental health treatment does not by itself establish the patient's incompetency to make treatment decisions. Under our decision in *Goedecke,* a court is prohibited from ordering the forced medication of an involuntarily committed but competent patient unless the court is satisfied that the patient's mental illness has so impaired his judgment as to render him "incapable of participating in decisions affecting his health." 198 Colo. at 411, 603 P.2d at 125. If the patient is competent to participate in the treatment decision, then the patient's refusal to submit to the proposed treatment must be respected out of the law's regard for a person's right to make decisions on matters affecting his own bodily integrity.

■ If the court is convinced of the patient's mental incompetency, it must then determine whether the proposed treatment is necessary either to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient causing serious harm to himself or others in the institution. This determination involves a consideration of two alternative factors. The first is the patient's actual need for the medication. To this end the court should focus on the nature and gravity of the patient's illness, the extent to which the medication is essential to effective treatment, the prognosis without the medication, and whether the failure to medicate will be more harmful to the patient than any risks posed by the medication. The alternative factor involves the issue of physical safety. The dangerousness of the patient to himself or others is a matter for consideration in the initial certification determination, §§ 27–10–107(1)(a), –109(1)(a), and –111(1), 11 C.R.S. (1982), and a similar concern is relevant in resolving whether antipsychotic medication should be administered to a patient who is incapable of participating in the treatment decision. The court, in resolving this question, should consider whether the patient's mental condition is such that in the absence of the proposed treatment the patient will

---

**10.** The trial judge, of course, may elect to talk to the patient. Any conversation between the court and the patient should be reported, transcribed, and made a part of the record.

likely constitute a continuing and significant threat to the safety of himself or others in the institution.

■ We point out here that it is not enough that the patient may have been violent on some occasion in the past. A good many people, both inside and outside of institutions, at one time or another have exhibited violent tendencies. While the state has a legitimate interest in institutional security, that interest is not sufficient to permit it to expose those committed to its care to the risk of antipsychotic medication solely for the purpose of alleviating the risk of some possibility of future injury or damage to the patient or others. Such a method of institutional control would be irreconcilable with the personal dignity of the individual and would render the patient's interest in bodily integrity nothing more than an illusion. What the state must establish is the likelihood that the patient, due to his condition, will cause serious harm to himself or others in the institution if not appropriately treated with antipsychotic medication.

■ The third element relates to the availability of less intrusive alternatives to antipsychotic medication. Here the focus encompasses not only the gravity of any harmful effects from the proposed treatment but also the existence, feasibility, and efficacy of alternative methods of treating the patient's condition or of alleviating the danger created by that condition. If less intrusive methods are available to effectively redress these concerns, then clearly the court should deny the motion for nonconsensual treatment.

■ Finally, the court must determine whether the need for antipsychotic medication is sufficiently compelling to override any legitimate interest of the patient in refusing treatment. The patient's refusal may stem from a prior unfavorable experience with similar treatment, an absolute and unequivocal religious belief or practice, advice from a family member, a personality clash with the attending physician, or any of a number of reasons. The court, to the extent permitted by the evidence, must determine whether the patient's refusal is bona fide and legitimate and, if so, whether the prognosis without treatment is so unfavorable that the patient's personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient placed in its charge and in protecting the safety of those in the institution.

■ We recognize that the resolution of the treatment decision will vary with the circumstances of the case and that the particular weight to be accorded the competing interests involved is impossible to predetermine. If the court grants the order for involuntary medication, it may place such time limits and conditions on the administration of the medication as are appropriate under the circumstances of the case. In any event, the order must not extend beyond the expiration date of the order of long-term care and treatment, which cannot exceed six months without further extension. §§ 27–10–109(4) and (5), 11 C.R.S. (1982). At the time of any hearing on the extension of the original order for long-term commitment, the patient is entitled to a new hearing on and determination of the need for the continued administration of antipsychotic medication.

### C.

■ The above standards apply to non-emergency situations only. Although no emergency was either claimed or established in this case, we recognize that there may be emergency situations requiring a physician or other professional person to override the patient's refusal of antipsychotic medication in order to protect the patient from inflicting immediate and serious harm on himself, to protect others from a similar danger, or to prevent the immediate and irreversible deterioration of the patient due to a psychotic episode. *See Davis,* 506 F.Supp. at 934–35; *Rogers,* 458 N.E.2d at 322. The state's legitimate interest in protecting those mentally ill patients committed to its custody will support immediate medical intervention when the delay

occasioned by ordinary recourse to the judicial process would itself place the physical well-being of the patient or others in immediate jeopardy. In these emergency situations, however, judicial authorization for continued treatment must be obtained as soon as practicable after the emergency in the event that continued treatment with antipsychotic medication is contemplated.

### IV.

A review of the record shows that the probate court applied standards substantially different from those set forth in this opinion. We are unable to determine, for example, what standard of proof the court applied in reaching its decision. Furthermore, although the record supports the probate court's determination with respect to the respondent's incompetency, the court made no determination that the antipsychotic medication was necessary to prevent a significant and likely long-term deterioration of the patient's mental condition. Rather, the probate court turned its discussion on the fact that the respondent "will most probably experience less anxiety" from the regular administration of the medication and will most likely be removed to a less restrictive environment upon his improvement. There is also a lack of support in the record for the probate court's determination that the respondent's likelihood of developing tardive dyskinesia could be properly monitored and controlled. It was Dr. Weiner's testimony that there was no known method for preventing the occurrence of this condition, that once it occurred the ensuing disability might continue notwithstanding the cessation of medication, and that there was a significant risk that the respondent might develop this condition in the not too distant future. The probate court also failed to consider whether a less intrusive treatment alternative was available to the attending psychiatrists and whether the present need for antipsychotic medication was sufficiently compelling to override any legitimate interest of the respondent in refusing treatment. Finally, the probate court's order failed to provide for review of the treatment order upon the extension of the respondent's cer-

tification for long-term treatment. Due to these deficiencies underlying the probate court's order, a remand is necessary.

The judgment of the court of appeals remanding the case to the probate court is affirmed. The case is accordingly remanded to the court of appeals with directions to return the case to the probate court for further proceedings in accordance with the views herein expressed.

ERICKSON, J., dissents.

ERICKSON, Justice, dissenting:

In my view, the majority opinion improperly imposes restraints on the professional judgment of the supervising authorities at the state hospital and their obligation to treat certified psychiatric patients.

The committed mentally ill had no common law right to refuse drug therapy administered in the institution. *Denny v. Tyler*, 85 Mass. (3 Allen) 225, 227–29 (1861). *Cf. Winters v. Miller*, 446 F.2d 65, 74 (2d Cir.), *cert. denied*, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); *Howard v. Howard*, 87 Ky. 616, 623, 9 S.W. 411, 413 (1888); *Price v. Sheppard*, 307 Minn. 250, 239 N.W.2d 905 (1976). No court has held that committed mental patients have a specific constitutional right to refuse treatment while institutionalized. Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment*, 72 Nw. U.L.Rev. 461, 491 (1978).

Colorado does provide that certified mentally ill patients "shall not forfeit any legal right or suffer legal disability" unless specified in a court order. § 27–10–104, 11 C.R.S. (1982). In *Goedecke v. Colorado Department of Institutions*, 198 Colo. 407, 603 P.2d 123 (1979), we declared that certified patients may refuse the drug Prolixin "in the absence of some finding, reached by a competent tribunal, that the patient's illness has so impaired his judgment that he is incapable of participating in decisions affecting his health." *Id.* at 411, 603 P.2d at 125. Incompetence can be shown by a finding that the patient lacks the capacity to participate in the decision or that the refusal of treatment is irrational or unreasonable. *Id.*

In *Goedecke*, the patient was able to participate in making the decision to use Prolixin. Medina is not able to cooperate with the mental health experts or his lawyers in making a treatment decision. He has an attention span of approximately thirty seconds, and has not been able to participate in discussions with his psychiatrist regarding drug therapy. Medina possesses the same rights as Goedecke, but the manner in which those rights are to be protected is the issue before us in this case. *See In re A.W.*, 637 P.2d 366 (Colo.1981).

The department of institutions has a legitimate interest in providing treatment to those in its custody and in protecting the patients and personnel at the state hospital from dangerous and destructive conduct by certified patients. *See Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The General Assembly, subsequent to the treatment hearing in this case, created a procedure for a hearing when a mentally ill patient refuses to accept medication. The statute permits the certifying court to consider a petition by the treating physician to have the court enter an order requiring the patient to accept treatment or to have the treatment forcibly administered. § 27–10–111(4.5), 11 C.R.S. (1982).

It is of paramount importance that the treating authorities in the institution be given broad latitude to use their professional training and experience to develop effective therapeutic programs for certified patients. The physician in charge of the patient is clearly best able to diagnose the patient's illness, prescribe the appropriate treatment (including the use of the antipsychotic drugs Prolixin and Thorazine), and monitor and control treatment and medication based on continuing observation of the patient. It is recognized that "[c]ourts should tread cautiously in reviewing medical decisions since they lack the competence to prescribe the details of adequate treatment...." Gaughan & LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution*, 4 Law & Psychology Rev. 43, 45 (1978) (footnote omitted).

The majority opinion and the court of appeals opinion unnecessarily extend the level of judicial review required by *Goedecke*. The majority's four-part test essentially amounts to a substitution of a trial court's judgment for that of the mental health experts at the state hospital. The majority requires a trial court to determine that drug therapy is necessary to prevent the long-term deterioration of the patient's condition and that a less intrusive treatment alternative is not available. It is clear that such findings are far beyond the expertise of a trial court, and the court would likely follow the advice of the mental health expert who gave the most convincing testimony at the hearing. The test laid down by the majority will unduly delay and interfere with the orderly administration of the state hospital. Psychiatric hospitals should be administered by mental health professionals and not by the courts. The courts are simply not qualified to prescribe treatment to be given patients at the state hospital in the first instance.

Medina was involuntarily certified by the probate court for psychiatric treatment. The state then petitioned the probate court for an order allowing treating authorities to medicate the patient despite the patient's objections. The court determined that respondent was incompetent to participate in the decision to use medication.[1] I would hold that once a certified patient is judicially determined to be incompetent to participate in the medication decision (the *Goedecke* test), the patient no longer has the right to arbitrarily refuse antipsychotic

---

**1.** The probate court treatment order reads, in full:

> THIS MATTER having come on for hearing on July 21, 1981 at 10:00 A.M. and the Court having heard the testimony of Kenneth L. Weiner, M.D., as well as arguments of counsel the Court FINDS:

1. The Respondent is mentally ill with a diagnosis of paranoia and the evidence in support thereof was clear and convincing.

2. As a result of the paranoia and delusions suffered by Respondent, the Respondent is not able to participate in a decision concerning treatment with medications.

3. The Court will substitute its judgment for Respondent on the basis that Respondent's

drugs prescribed by state treating authorities in the first instance. Medina was committed to the supervision of mental health experts who were charged with responsibility for his care and treatment.

A certified, incompetent patient can always seek posttreatment review of the treatment decision under section 27–10–112, 11 C.R.S. (1982).

I would reverse the court of appeals and affirm the probate court's order directing that the treating physician may administer antipsychotic medications to respondent.

refusal to take medications was unreasonable. The evidence suggests that with regular medication Respondent will most probably experience less anxiety resulting in his release to a less restrictive environment and permit Respondent to live a more stable life.

4. The medical chart does not reflect any past major side effects from the use of antipsychotic medication. The doctor's testimony also suggests that tardive dyskinesia and other side effects from the use of antipsychotic medications can be properly monitored and controlled.

5. The risk of tardive dyskinesia is not so great so as to preclude the use of antipsychotic medications such as Prolixin and Thorazine.

IT IS THEREFORE ORDERED that:

1. The physician attending Respondent may administer antipsychotic medications such as Prolixin and Thorazine, however, without limitations to the two medicines and the attending physician shall use whatever medical procedures good medical practice would direct to properly monitor and control the medications.

2. This Order permitting the use of involuntary medication shall exist so long as the Respondent is under certification.

3. The Clerk of this Court issue copies of this Order, duly certified, to the Respondent, to Respondent's attorney and to Fort Logan Mental Health Center.