2014 COA 57

**The PEOPLE of the State of Colorado, Petitioner–Appellee,**

**IN the INTEREST OF Larry Wayne MARQUARDT, Respondent–Appellant.**

**Court of Appeals No. 14CA0105**

Colorado Court of Appeals, Div. II.

Announced April 24, 2014

Gregory J. Styduhar, County Attorney, David A. Roth, Special Assistant County Attorney, Pueblo, Colorado, for Petitioner–Appellee

The Law Firm of John L. Rice, John L. Rice, Pueblo, Colorado, for Respondent–Appellant

Opinion by JUDGE ASHBY

¶ 1 Respondent, Larry Wayne Marquardt, appeals from the trial court's order authorizing the involuntary administration to him of antipsychotic medication. We reverse.

## I. Background

¶ 2 Mr. Marquardt was committed to the Colorado Mental Health Institute at Pueblo (CMHIP) after having been found not guilty by reason of insanity in a criminal case. He has been diagnosed with schizoaffective disorder, bipolar type, with prominent paranoia.

¶ 3 Since arriving at CMHIP, Mr. Marquardt has been voluntarily taking ten milligrams of Saphris, an antipsychotic medication, once a day. The People petitioned the court to slowly increase the dosage to 20 milligrams per day because he refused to take any dosage above 10 milligrams per day,

and his psychiatrist felt that the medication was not effective at that dosage.

¶4 After a hearing, at which both the psychiatrist and Mr. Marquardt testified, the court ordered that the dosage of this medication could be increased over his objection.

¶5 Mr. Marquardt appeals.

## II. Discussion

█ ¶6 Mr. Marquardt contends that the trial court erred in applying the elements established in *People v. Medina,* 705 P.2d 961 (Colo.1985) to the facts of this case.

¶7 As a matter of first impression, we must first decide whether *Medina* is applicable to a nonemergency request to increase antipsychotic medication dosage over a patient's objection. We conclude that it is. We also agree with Mr. Marquardt that the trial court applied an incorrect legal standard in deciding that the evidence presented supported a finding under *Medina* that an increased dose of his antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in his mental condition.

¶8 In *Medina,* the supreme court found that a patient has a right under both common law and Colorado's statutory scheme relating to involuntary commitment to refuse unwanted treatment that could result in serious and permanent disabilities. *Id.* at 971. The court noted that the common law had long protected a person's right to personal autonomy and bodily integrity. This protection was founded upon the principle that the individual is best suited to weigh the risks and benefits of treatment and to decide what the best course of treatment is for him or her. *Id.* at 968.

¶9 However, the *Medina* court held that an involuntarily committed patient's right to autonomy and bodily integrity is not absolute. There are legitimate state interests in providing care to the patient and security to others, which must also be considered. *Id.* at 971.

¶10 The procedural protections and standards established in *Medina* therefore sought to accommodate the following considerations: (1) the patient's right to participate in treatment decisions affecting his own body; (2) the state's legitimate interests in providing treatment to a patient placed in its charge; and (3) safeguarding patients, staff, and others in the treatment facility. *Id.* at 972. Due to the potentially long-term and debilitating effects of antipsychotic medication, the development of guidelines to ensure that courts would weigh each of these interests before ordering the administration of such medication over a patient's objection was warranted.

¶11 The *Medina* considerations apply equally to a patient's objection to an increase in the dose of antipsychotic medication as to an objection to take medication at all. Therefore, we discern no legal basis on which to distinguish between an objection to taking an increased dose of medication and an objection to taking medication at all. We now address Mr. Marquardt's specific contentions of error.

¶12 Reviewing a trial court's application of the *Medina* elements to the facts of a particular case presents a mixed question of law and fact. *People in Interest of Strodtman,* 293 P.3d 123, 131 (Colo.App.2011). Thus, we defer to the trial court's findings of fact if supported by the record and review its legal conclusions de novo. *Id.*

█ ¶13 Under *Medina,* a physician seeking to administer antipsychotic medication to a patient must prove, by clear and convincing evidence:

(1) that the patient is incompetent to effectively participate in the treatment decision; (2) that treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient's causing serious harm to himself or others in the institution; (3) that a less intrusive treatment alternative is not available; and (4) that the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.

705 P.2d at 973; *see also* § 27–65–127(2)(a)– (b), C.R.S. 2013 (a court may deprive a per-

son of a legal right only if it finds that (a) the person has a mental illness and is a danger to himself or herself or others, is gravely disabled, or is insane; and (b) the requested deprivation is both necessary and desirable).

¶ 14 "Clear and convincing evidence is evidence persuading the fact finder that the contention is highly probable." *People in Interest of A.J.L.*, 243 P.3d 244, 251 (Colo. 2010) ("The clear and convincing evidence standard requires proof by more than a 'preponderance of the evidence,' but it is more easily met than the 'beyond a reasonable doubt' standard used in criminal proceedings.").

¶ 15 Although Mr. Marquardt challenges the trial court's application of each of the *Medina* elements to the evidence presented here, he primarily argues the second element. The parties agree, and the trial court found, that, within that element, there was no basis to find that Mr. Marquardt posed a risk of harm to himself or others at the time of the hearing. Instead, the issue is whether, absent the increased dosage, Mr. Marquardt will suffer a significant and likely long-term deterioration to his mental health.

¶ 16 Mr. Marquardt's primary objection to taking an increased dosage is his belief that there is a risk of serious side effects, such as tardive dyskinesia—involuntary muscle movements that can become permanent. Mr. Marquardt signed releases of information for his psychiatrists to access his prior medical history; yet, as of the hearing date, medical records to substantiate Mr. Marquardt's self-reported negative side effects from medication had not yet been received by his psychiatrists. The record does not show that Mr. Marquardt has suffered the serious side effects of which he is concerned. To the contrary, in clinical use, any serious side effects associated with Saphris have not been reported. Still, Mr. Marquardt distrusts his treating psychiatrists, in part due to his mental illness; has independently researched various medications and their side effects; and has difficulty effectively discussing treatment options with them.

¶ 17 Mr. Marquardt's treating psychiatrist testified that, at the current dosage, Saphris is only partially therapeutic, as it is not treating all of Mr. Marquardt's symptoms. Even so, Mr. Marquardt is stable at this dosage, is participating in therapy groups and other treatment, has been cooperative with staff, complies with the rules of the unit, and has obtained the highest behavioral level on the ward.

¶ 18 The trial court found that, while Mr. Marquardt had previously exhibited violent behavior, since his admission to the facility, the extent of his violent behavior was that he had been argumentative with staff. The psychiatrist noted that there had been a "continuous de-compensation and deterioration over time" in Mr. Marquardt's mental health when looking back at his mental health history over the last thirty years; he did not adequately explain how, on the current medication and dosage, Mr. Marquardt will further deteriorate over time. Rather, his testimony and affidavit both suggest that, although Mr. Marquardt may be unlikely to continue to improve or to be released to a less restrictive facility at the current dosage, at this time he does not see any indication that Mr. Marquardt will either refuse to participate in treatment or experience a significant and long-term deterioration if his dosage is not increased. The trial court's findings and order also recognize that Mr. Marquardt is not deteriorating at his current dosage, but that without the increased dose of medication, his symptoms and overall mental condition may not improve and he might not be released from the hospital.

¶ 19 We acknowledge that *Medina* may be too restrictive in limiting judicial power to order medication over a patient's objection to circumstances that (1) prevent long-term deterioration or (2) present a danger to the patient or others in the facility. A third circumstance, when appropriately balancing the state's and patient's interests, may include when, without medication or an increase in dosage, the patient is unable over time to effectively progress or benefit from treatment.

¶ 20. But the plain language in *Medina*, which permits court-ordered medication to prevent long-term deterioration, does not include the ability to order medication solely

to improve or expedite a patient's participation in treatment or likelihood of release, however laudable those goals may be. *See People v. Allen*, 111 P.3d 518, 520 (Colo.App. 2004) (the court of appeals is bound by decisions of the supreme court). To the contrary, the supreme court found that the probate court's determination that there would be positive effects on the patient's treatment from the medication to be a substantially different holding than a determination that administration of medication was necessary to prevent a significant and likely long-term deterioration of the patient's medical condition. *Medina*, 705 P.2d at 975 ("[T]he [probate] court made no determination that the antipsychotic medication was necessary to prevent a significant and likely long-term deterioration of the patient's medical condition. Rather, the probate court turned its discussion on the fact that the respondent 'will most probably experience less anxiety' from the regular administration of the medication and will most likely be removed to a less restrictive environment upon his improvement.").

¶ 21 Although the evidence supports the trial court's finding that Mr. Marquardt is unlikely to improve at the current dosage, that is not the correct legal standard under *Medina*. Thus, the trial court erred by ordering an increased dose of antipsychotic medication to Mr. Marquardt over his objection. *Cf. Donaldson v. Dist. Court*, 847 P.2d 632, 635 (Colo.1993); *Strodtman*, 293 P.3d at 133; *People v. Pflugbeil*, 834 P.2d 843, 847 (Colo.App.1992). In light of this conclusion, we need not address Mr. Marquardt's remaining contentions of error.

¶ 22 The order is reversed.

JUDGE RICHMAN concurs.

JUDGE CASEBOLT concurs in part and dissents in part.

JUDGE CASEBOLT, concurring part and dissenting in part.

¶ 23 I fully concur with the majority's conclusion that the principles articulated in *People v. Medina*, 705 P.2d 961, 973 (Colo.1985), apply in determining whether an increase in medication dosage over a respondent's objection may be ordered by a court. I part company with the majority, however, in its determination that the trial court misapplied the "deterioration" element set forth in *Medina* in finding that the increase for respondent, Larry Wayne Marquardt, was necessary to prevent a significant and likely long-term deterioration in his mental condition. In my view, the majority interprets that factor in too restrictive a manner and without sufficient regard for the full test that *Medina* directs. Accordingly, I respectfully dissent from the majority's reversal of the trial court's order authorizing an increase in the dosage of the medication Marquardt was voluntarily taking.

¶ 24 In *Medina*, the court articulated a four-part test for trial courts to apply in determining whether to order the administration of antipsychotic medication against the wishes of a mentally ill person. The pertinent part of the test that is at issue here is whether the proposed treatment is "necessary to prevent a significant and likely long-term deterioration in the patient's mental condition." *Id.* The majority holds that the trial court's interpretation and application of that standard to the facts is erroneous. But in doing so, the majority fails to consider the complete test:

> The[ ] determin[ation] whether the proposed treatment is necessary ... to prevent a significant and likely long-term deterioration in the patient's mental condition.... involves a consideration of two alternative factors. The first is the patient's actual need for the medication. [T]he court should focus on the nature and gravity of the patient's illness, the extent to which the medication is essential to effective treatment, the prognosis without the medication, and whether the failure to medicate will be more harmful to the patient than any risks posed by the medication. The alternative factor involves the issue of physical safety.

*Id.*

¶ 25 The majority, in my view, fails to recognize and apply the noted factors and instead views "deterioration" in isolation, noting that Marquardt is stable on his current dosage. It also holds that the deterioration

factor does not include the ability to order medication solely to improve a patient's condition or his participation in treatment. In doing so, the majority ignores the nature and gravity of Marquardt's illness, the extent to which the increased dosage is essential to his effective treatment, and his prognosis without the increased dosage. It also fails to consider whether the failure to medicate Marquardt will be more harmful than the risks posed by the medication. Employing those elements here, the following evidence supports the trial court's conclusion that the increased dosage was necessary to prevent a significant long-term deterioration in Marquardt's mental health.

¶ 26 The treating psychiatrist tendered an affidavit to the court, which included a copy of his seventeen-page psychiatric assessment. In the affidavit, the psychiatrist opined that all the information submitted "documents clearly that [Marquardt] is continuing to deteriorate in his level of functioning, using his considerable intelligence to work against any treatment plans that mean to change his thinking. He is profoundly mistrustful of treatment professionals." The psychiatrist went on to state that Marquardt's "medication has been only partially effective in stabilizing his psychosis and reducing his violence and threats.... I am now trying to determine whether Saphris will be effective in controlling his illness and cannot do so until I raise his dosage above his current dosage." The psychiatrist documented his consultation with a clinical pharmacist and noted that half of the patients at the Colorado Mental Health Institute in Pueblo (CMHIP) who were taking Saphris found a ten milligram dose a day effective in helping control the illness and the other half required fifteen or twenty milligrams a day before it became effective.

¶ 27 The psychiatrist then set forth his diagnosis of Marquardt and discussed how the current ten milligram dose of Saphris was not controlling Marquardt's condition:

Mr. Marquardt is showing Persecutory Delusions along with Grandiose Delusions that prevent him from learning from reality experience and teaching. He also previously showed command auditory hallucinations that were part of his Instant Offense and which are, now, partially controlled with his current dose of Saphris. He believes he can make the same judgments physicians make, by virtue of his readings. Indeed, he denies he has a mental illness and cannot grasp that medications can prevent his illness from leading to violence.

¶ 28 The psychiatrist then opined that the increase in dosage was necessary to prevent the significant and long-term deterioration in Marquardt's mental condition and to prevent the likelihood of causing serious harm to others in the institution. He concluded the affidavit by noting that he had advised Marquardt that if he did not take the medications, the adverse effects would be dangerous behavior, paranoid delusions of persecution and grandiosity, personality deterioration, institutionalization, and inability to gain discharge to the community.

¶ 29 At the hearing, the psychiatrist noted that Marquardt had been admitted to CMHIP with a thirty-year mental illness and a history of violence, and that his latest incident involving violence was an attack upon his mother, which had precipitated an attempted murder charge. According to Marquardt, she had been harassing him, and "he g[ot] electronic transmissions that tell him that his members of his family are harassing him." He had been adjudicated not guilty by reason of insanity. The psychiatrist also noted that Marquardt had previously been hospitalized, but had been able to be discharged when he was court-ordered to take medication.

¶ 30 The psychiatrist testified that Marquardt had accepted a ten-milligram dose of Saphris, but opined that this dosage was "subtherapeutic, because he's only partially responding to this medication. And he's been on it for many months." He further testified that he did not believe Marquardt had reached therapeutic benefit from the current dose because "he continues to deny that he is mentally ill." He opined, based on the psychiatric assessment, his affidavit, and the other reports he had viewed and submitted, that in the absence of the ability to treat Marquardt with Saphris up to twenty milligrams per day, Marquardt would have a

significant and likely long-term deterioration in his mental condition because "there has been continuous de-compensation and deterioration over time, in this patient."

¶ 31 During cross-examination, the psychiatrist testified that Marquardt's illness was "only going to get worse, the longer it goes untreated. And this treatment that he's got now is partially effective. . . . He takes medications just because he doesn't want to have to deal with the voices. And the . . . medication does make the voices go away. So he stays only on that level. And his delusions prevent him from going any further in admitting that he is ill."

¶ 32 Upon completion of cross-examination, the court questioned the psychiatrist, asking, "You'd indicated that he had not deteriorated since he's been here. Do you have any reason to believe that he's going to deteriorate further, if he doesn't have the increase in medication?" The witness responded:

> [M]y view is that he arrived in a deteriorated condition. And he is so intelligent that he is able to function reasonably well, while in a hospital, under protected structure, and that the structure helps him function. But his level of function is still not where it needs to be, for him to be moved forward, or to benefit from the groups that he's going to, and learning what he needs to know, in order to eventually be released. And so, the deterioration is manifested by continuing delusions of persecution and grandiosity that control his thinking, while the hallucinations appear to be absent at this point. The delusions are still present. And that is the sign of deterioration I am concerned about.

When the court inquired, "But there's no evidence that he's going to get worse, than he is, right now?" the witness replied, "I can't say that he's going to get worse at this point. He may be able to hold it together."

¶ 33 The majority relies upon these latter statements responding to the court's questions for its conclusion that the court misinterpreted and misapplied the "deterioration" portion of the *Medina* test. But considering the nature and gravity of Marquardt's illness, the extent to which the increase in medication is essential to his effective treatment,

his prognosis without the medication, and that the failure to increase the dosage will likely be more harmful to Marquardt than the slight risk of tardive dyskinesia, in my view the court correctly interpreted and applied the deterioration factor. Indeed, when considering the issue of physical safety, which is another factor in the deterioration test, the psychiatrist's testimony supports the view that Marquardt may be a greater risk to the physical safety of others in CMHIP on the lower dose of medication.

¶ 34 In sum, the majority's conclusion fails to consider all the *Medina* "deterioration" elements, and could lead to unintended consequences. Essentially if, as here, a treating psychiatrist starts a patient on a dosage of medication that fails to yield optimal therapeutic results, the majority's understanding of the "deterioration" criterion could prevent any increase in the chosen medication dosage. I do not view that interpretation to be sound.

¶ 35 Although the majority does not (and need not) discuss the remaining *Medina* factors, I conclude that the People presented sufficient clear and convincing evidence to satisfy the remaining factors. Therefore, I respectfully dissent from the majority's reversal of the order.