JUDGE BERNARD,
concurring in part and dissenting in part.
¶ 46 There are two competing imperatives in this case. The majority focuses on a strong moral imperative: that C.J.R.’s human dignity will be compromised because he will be treated, against his will, with a strong drug that has potentially feminizing side effects. I rely on what I believe is a strong legal imperative: that 'the four-factor test found in People v. Medina, 705 P.2d 961, 973 (Colo. 1985), controls the analysis in this ease.
¶ 47 As the reader will be able to tell from the majority opinion and from the dissent, these two" imperatives pull strongly in opposite directions. I have empathy for' C.J.R., but I also think that the probate court properly applied the existing law. I am concerned that the majority’s desire to accommodate CJ.R.’s moral imperative will draw a tight perimeter around Medina, limiting its use primarily to doctors’ requests to treat patients with antipsychotic drugs. In doing so, the majority opinion could alter the way that we analyze the requests of doctors to treat incompetent patients against their will with drugs or technologies that do not fall within that tight perimeter.
¶ 48 And I am also concerned about something else because there is a second moral imperative in this case that is aligned with the legal one. Because of his mental illness, C.J.R. is dangerous. And, by only heeding his moral imperative, I am concerned -that the majority gives short shrift to the moral imperative of protecting other patients and the staff at the Colorado Mental Health Institute at Port Logan, where C.J.R. is hospitalized.
¶ 49 So, even if-I did not have the legal imperative of Medina to support my position, I would still dissent because I think that the moral imperative of protecting those people has more persuasive force than the moral imperative of saving C.J.R. from a potent drug that he does not want to take.
f 50 I concur with thé majority’s decision to affirm the probate-court’s order that allowed the staff at the Institute to administer medication to CJ.R. through a nasogastric tube.' But I respectfully dissent from the majority’s decision to reverse the probate court’s order that allowed the Institute to treat C.J.R. against his will with Depo-Prov-era.
I. “We have often noted that issues not presented to or raised in the trial court will not, as a general matter, be considered on appeal.”
—Roberts v. Am. Family Mut. Ins. Co., 144 P.3d 546, 549 (Colo. 2006)
¶ 51 The majority asserts that the “threshold question” in this case-is “whether Medina applies to a request to involuntarily administer” Depo-Provera “as part of the treatment for a mentally ill, male patient at a state hospital for the express purpose of controlling his sexually inappropriate behavior.”
¶ 52 This statement in the' majority’s opinion is the first time that this question has appeared in this case. Neither of the parties raised that issue in the trial court. Instead, both sides contended that Medina applied, although they disagreed about whether Medina’s four-factor test had been satisfied. The probate court thought that Medina applied. And both parties contended on appeal that Medina applied, although they again disagreed about whether it had been satisfied. The first time that the parties faced the issue of whether Medina applied to this case was when we asked them for supplemental briefs after C.J.R. had filed his reply brief.
¶ 53 Unlike the majority, I would not pose a question that was never asked of the trial court in this case and then answer it. See Estate of Stevenson v. Hollywood Bar & Cafe, Inc., 832 P.2d 718, 721 n.5 (Colo. 1992) (“Arguments never presented to, considered *545 or ruled upon by a trial court may not be raised for the first time on appeal”).
¶ 54 In response, the majority asserts that C.A.R. 1(d) supports its decision to analyze this issue. I question whether it is a good idea to do so in a case in which neither of the parties had raised the issue at any point of the proceedings until we asked them for supplemental briefs. As our supreme court has pointed out, appellate courts generally decline to resolve issues that the parties have not addressed in their briefs or during,their arguments. Moody v. People, 159 P.3d 611, 614 (Colo. 2007). “Such self-restraint is derived from the contours of our adversarial system [because] ‘appellate courts do not sit as self-directed boards of legal inquiry and research... Id. (quoting Rose v. United States, 629 A.2d 626, 536-37 (D.C. 1993)). Appellate courts are instead “arbiters of legal questions presented and argued by the parties before them.” Id. (quoting Rose, 629 A.2d at 536-37).
¶ 55 But, since the majority has raised this question and provided its own answer, I will provide mine below.
II. “After a century of studying schizophrenia, the cause of the disorder remains unknown.”
—Dr. Thomas R. Insel, Neuroscientist, Psychiatrist, and Head of the National Institute of Mental Health from 2002 to 2015, Rethinking Schizophrenia, https:// perma.cc/8HG9-TXA7
¶ 56 No one really knows what causes schizophrenia and its related psychotic conditions. “Researchers believe that a number of genetic and environmental factors contribute to causation, and life stresses may play a role in the disorder’s onset and course.” American Psychiatric Association, What is Schizophrenia?, https://perma.cc/JAY2-PKT4. “Since multiple factors may contribute, scientists cannot yet be specific about the exact cause in individual cases.” Id. Researchers offer several major .theories of causality: genetics; environmental factors, such as viruses, or malnutrition; imbalances in brain chemistry; and substance abuse. National Alliance on Mental Illness, Schizophrenia, https://perma. cc/7KDY-NZKZ; see also National Institute of Mental Health, Schizophrenia, https:// perma.cc/DH2U-VLB8.
¶ 57 People with schizophrenia and related disorders suffer a variety of symptoms, including delusions, hallucinations, and disorganized thinking. American’ Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 87-88, 99 (5th ed. 2013) (DSM-V). There is no known cure. American Psychiatric Association, What is Schizophrenia?; National Alliance on Mental Illness, Schizophrenia.
¶ 58 Even though schizophrenia- and its related disorders are incurable, they can' be treated. One major form of treatment is anti-psychotic medication. American Psychiatric Association, What is Schizophrenia? These drugs work well for some people, reducing the frequency of the disorder’s symptoms and the incidence of relapses, so that they can live “highly productive and rewarding lives.” Td
¶ 59 C.J.R. is not one of those people. He is sixty years old, and he has been hospitalized, mostly at the Institute, for the last twenty-four years. Doctors have diagnosed him as suffering from - schizophrenia or schi-zoaffective disorder for this entire time. (A person who suffers from schizoaffective disorder shows both psychotic symptoms--and a mood disorder, such as depression or mania. DSM-V at 105-07.)
¶ 60 He has hallucinated about dead babies. He has expressed the. general belief — a delusion — that, his food-and his medicine have been .contaminated and the specific delusion that there have been gonorrhea “germs” in his food and in his medicine. His psychiatrist believes that he “continues to show disorganized thinking, speech and behavior.”
¶ 61 C.J.R. does not have any insight into his condition. He has never told his psychiatrist, who has treated him for the last eight years, that he realizes that he suffers from a mental illness. Instead, he says that she has misdiagnosed him.
¶ 62 The psychiatrist-has tried to talk with him about the benefits, risks, and potential alternatives to the medication that, has been prescribed for him. He sometimes refused to *546 have these discussions, and he sometimes said that he did not see that the medications had any benefits and that they offered only risks. Over the years, he has made it clear to the psychiatrist that (1) he did not “agree with the medications”; (2) he did not accept the validity of prior court orders that authorized the psychiatrist and the staff to administer medication to him against his will; and (3) he would refuse the medication if “given the choice.” He “regularly refused” medications “in defiance” of court orders.
¶ 63 He does not want to take his medications because he does not think that they help him. But, according to a letter that the psychiatrist wrote to the probate court, “when [he] receives medications on a more consistent basis, his level of functioning is better and his symptoms are less; when he refuses medication, he struggles more, and his symptoms appear to increase.” And his delusion that his food and his medicine are contaminated leads him to refuse them both.
¶ 64 This lack of insight is not unusual. “Some individuals with psychosis may lack insight or awareness of their disorder,” which may extend to a lack of awareness of schizophrenia’s symptoms. DSM-V at 101. “Unawareness of illness is typically a symptom of schizophrenia itself rather than a coping strategy.” Id.
¶ 66 C.J.R. is given a lot of medication, which falls into four general categories: anti-psychotic drugs, mood stabilizers, anti-anxiety medicines, and medication to treat the side effects associated with antipsychotic drugs. The Institute’s staff tests him frequently to determine whether his medication remains at therapeutic levels in his system and to monitor its side effects. The goal of these tests is to ensure that his medications are administered safely.
¶ 66 CJ.R.’s behavior has been troublesome for a long time. For example, when doctors tried to wean him off of Clozaril, the antipsychotic drug that he had taken for a long time, the results were “disastrous.” He became aggressive and assaultive, and he damaged property. According to the psychiatrist, “[historically, he has been quite violent when not taking regular medication.”
¶ 67 He has also engaged in sexually inappropriate behavior. He has often emerged naked from his room into the ward, where there are both men and women. He has masturbated in front of members of the Institute’s staff. But he would normally comply when a staff member told him to put on clothes.
¶ 68 “[N]ormally comply” is now a concept that belongs to the past tense. His behavior has recently crossed the line from troublesome to threatening.
¶ 69 He sexually assaulted a nurse in early May 2016, grabbing her breasts and her genital area. He “repeatedly and inappropriately solicited staff members for sex.” He walked naked through the common areas of the ward, where his nudity traumatized vulnerable female patients, and he refused to put on clothes. He became more physically aggressive, “punching, kicking, [and] scratching” staff members.
¶ 70 CJ.R.’s psychiatrist said that he now hears voices, which she called command hallucinations, almost every day. The voices tell him to be naked and to have sex with other people.
¶ 71 These changes appear to be related to a change in C.J.R.’s medication. The Institute’s staff had begun treating him with Clo-zaril in 1996, and the psychiatrist thought that it had helped to control his sexually inappropriate behavior. But, in February of 2016, he had a grand mal seizure, and he was transported to a Denver hospital. Subsequent testing showed that the Clozaril level in his blood had risen above therapeutic levels, even though testing the week before had shown that the drug’s level was within therapeutic limits. The doctors at the Denver hospital “highly suspected” that the elevated Clozaril levels had caused the seizure. And, somehow, C.J.R,’s ability to metabolize Clo-zaril could have changed, so- it was unclear whether he could still be treated with that drug. He remained in the Denver hospital until the end of March. The doctors there prescribed anti-seizure medicine for him, which the Institute’s staff continued to administer after he returned.
*547 ¶ 72 CJ.R.’s sexually inappropriate behavior got worse when he returned to the Institute after his seizure, even though the psychiatrist treated him with two other anti-psychotic drugs, Prolixin and olanzapine.
III. “Antipsychotic medications, either alone or in combination, can cause numerous and varied side effects and carry with them the risk of serious and possibly permanent disabilities in the patient.”
—Medina, 705 P.2d at 968
¶ 73 The potential side effects associated with antipsychotic drugs are no picnic. “Met abolic, neuromuscular and cardiovascular side effects are common in patients receiving antipsychotic medications for any indication. ...” American Psychiatric Association, Choosing Wisely, https://perma.cc/P342-J93 L. More prosaically, those symptoms include drowsiness, dizziness, restlessness, weight gain, dry mouth, constipation, nausea, vomiting, blurred vision, low blood pressure, uncontrollable movements (“such as tics and tremors”), seizures, and “a low number of white blood cells which fight infections”. National Institute on Mental Health, Mental Health Medications, https://perma.cc/7WD8-PXXJ. Some antipsychotic medications cause rigidity, persistent muscle spasms, and tremors. Id. Long-term use of certain antipsy-chotic drugs can lead to tardive dyskinesia, a potentially permanent condition that causes involuntary muscle movement. Id.
¶ 74 Depo-Provera can cause serious side effects in men. According to C.J.R.’s psychiatrist, it can, among other things, feminize a man’s appearance, decrease muscle mass, shrink testicles, lower sperm count, cause erectile dysfunction, lead to the development of female-like breasts, and bring on osteoporosis.
¶ 75 But both types of drugs have upsides. As I have indicated above, antipsychotics are used to treat the symptoms of schizophrenia. Depo-Provera contains a female hormone that is used in some birth-control drugs. The psychiatrist said that there was “considerable clinical evidence” that Depo-Provera “reduced libido, and, given [C.J.R.’s] hypersexual behavior,” this drug could “help him manage his sexual urges.”
¶ 76 The Institute’s staff would administer the Depo-Provera to C.J.R. by injection, and one injection would last ninety days. The psychiatrist thought that she would know whether the Depo-Provera was having its desired effect during the ninety-day period. (There is no indication in the record that this course of treatment could or would effect a gender reassignment.)
¶ 77 The psychiatrist added that the Institute’s staff would monitor C.J.R. regularly to watch for Depo-Provera’s side effects. She thought that the purpose of administering the Depo-Provera to C.J.R. was to prevent his behavior that was “dangerous to others.” She did not know whether it would prevent a long-term deterioration of his mental condition.
IV. “Some griefs are medicinable.”
—William Shakespeare, Cymbeline act III, sc. 2
¶ 78 The four-part Medina test does not only apply to antipsychotic drugs. It comes from a broader background, and it has been applied to other kinds of treatment.
• Medina states that incompetent patients “have the right under appropriate circumstances to legitimately refuse treatment that poses a significant risk to their physical well-being,” 705 P.2d at 967 (emphasis added).
• Goedecke v. State, Department of Institutions, 198 Colo. 407, 411, 603 P.2d 123, 125 (1979), a case upon which the supreme court relied heavily in Medina, observed that Colorado courts have historically “acknowledged” that doctors must obtain a competent patient’s informed consent “for treatment with drugs having possible harmful side effects.” (Emphasis added.)
• Section 27-65-lll(5)(a), C.R.S. 2015, states that a probate court may “entel-an order requiring that ... [a] person accept such treatment or, in the alternative, that the medication be forcibly administered.” (Emphasis added.)
*548 • A division of this court held that it .was appropriate for a probate court to rely on the Medina factors when evaluating whether to grant a hospital’s request to force an incompetent patient to undergo electroconvulsive therapy, see People in Interest of M.K.M., 765 P.2d 1075, 1076 (Colo. App. 1988).
¶ 79 Turning now to the four Medina factors, 705 P.2d at 973, I resolve them as follows.
¶ 80 Was C.J.R. incompetent to participate effectively in the treatment decision? He concedes on appeal that he was incompetent.
¶ 81 Was the Depo-Provera treatment necessary to prevent a significant and likely long-term deterioration in the patient’s mental condition or to prevent the likelihood that the patient will cause serious harm to himself or others in the institution? C.J.R. concedes part of the second Medina factor — the likelihood that he will cause serious ham to himself or others in the institution — because he agrees that “he becomes aggressive and as-saultive when [he is] not controlled through medication.” But he contends that .the record does not support the probate court’s decision that Depo-Provera was necessary to prevent his aggressive and assaultive behavior;
¶ 82, Much of C.J.R.’s focus when discussing the probate court’s application of Medina is on what he characterizes as a sufficieney-of-the-evidence problem that is based on an absence of information in the record. He points out that the record does not show whether the side effects associated with Depo-Provera are likely or unlikely to occur. He contrasts the state of the record in this case with the state of the record in Medina, in which there was substantial testimony about the side effects of the antipsychotic drug that was the focus of that case. He states that the record does not show whether Depo-Provera is an antipsychotic drug.
¶ 83 I disagree with C.J.R.’s contentions for the following three reasons.
¶ 84 First, I reject his assertion that we must reverse the probate court’s order because the record does not establish that Depo-Provera “is an antipsychotic medication” or that the drug will “address[ ]” his “psychotic behavior.” Rather, I think that this assertion is a red herring.
¶ 86 As I have indicated above, I believe that the pertinent law in Colorado focuses on any involuntary treatment that has thé potential for serious side effects. See Medina, 705 P.2d at 967; Goedecke, 198 Colo. at 411, 603 P.2d at 125; M.K.M., 766 P.2d at 1076. And the supreme court has recognized that antipsychotic drugs are powerful; that they can cause serious, perhaps permanent side effects; that they are “far more debilitating” than a patient’s involuntary commitment to a treatment facility; and that their beneficial side effects are evanescent, lapsing after they leave the patient’s blood stream. Medina, 705 P.2d at 968-69.
¶ 86 I conclude that the probate court, when its analysis equated Depo-Provera with an antipsychotic drug, recognized that Depo-Provera was powerful and that its use posed the risk of significant, potentially harmful side effects. In other words, by applying Medina, the probate court treated the psychiatrist’s request to use Depo-Provera with the seriousness that our supreme court expects when the potential of involuntary treatment with a powerful drug looms, over ,an incompetent, patient.
¶ 87 Second, while I agree with C.J.R.’s contention that the record does not establish the likelihood that he will suffer one or more of the ’ side effécts associated with Depo-Provera, I disagree with him over how important that missing information was. Although'the psychiatrist did not testify to statistical likelihoods, she clearly listed, some of the potential side effects. While they are indeed serious and significant, the probate court knew that they were possibilities. And it appears that the court assumed that C.J.R. would suffer from any or all of them: the court wrote in its order that C.J.R.’s “valid objections to the feminizing side effects of Depo-Provera [were] overridden by the [hospital’s] compelling interest ]” in “assur[ing] the safety of all concerned.”
¶ 88 Third, C.J.R. points to out-of-state authority concerning Depo-Provera, which states that it has been used as a mode of “chemical castration” for sexually violent fel *549 ons. But these eases do not help him. People v. Collins, 110 Cal.App.4th 340,1 Cal.Rptr.3d 641, 646 (2003), observed that a man who had been involuntarily hospitalized in a civil proceeding because he was a sexually violent felon had been treated with Depo-Provera. The opinion did not discuss the drug’s risks, and it did not suggest that the drug’s use had been inappropriate.
¶ 89 But Collins■ did cite a law review article that discussed the pros and cons of using Depo-Provera. Peter J. Gimino III, Comment, Mandatory Chemical Castration for Perpetrators of Sex Offenses Against Children: Following California’s Lead, 26 Pepp. L. Rev. 67 (1997). Although the author recognized that Depo-Provera‘had significant side effects, id. at 73-76, he added that “[m]ost reported side effects rarely occur, ... and they are all reversible after ... treatment is terminated,” id. at 75-.
if 90 The author of another law review article that I have found noted that, although Depo-Provera has “significant side effects,” it may “significantly reduce recidivism rates in certain male offenders” by “reducing testosterone production and consequently the offender’s sex drive.” Zachary Edmonds Oswald, Note, “Off With , His_Analyzing the Sex Disparity in Chemical Castration Sentences, 19 Mich. J. Gender & L. 471, 477 (2013). (I acknowledge that the Food and Drug Administration has “recommended that Depo-[P]rovera only be taken for up to two years because extended use results in loss of bone density and other severe side effects.” Haley A. Smith, Comment, Common Enemy and Political Opportunity Leave Archaically Modern Sentencing Unchecked: The Unconstitutionality of Louisiana’s Chemical Castration Statute, 59 Loy. L. Rev. 211, 236 n.136 (2013).)
¶ 91 C.J.R. also cited Tran v. State, 965 So.2d 226 (Fla. Dist. Ct. App. 2007). But that opinion did not discuss the risks or benefits of Depo-Provera. It concluded, instead, that a court had violated the Constitution’s Double Jeopardy Clause when it ordered a defendant in a criminal case to undergo therapy with that drug several months after the court had imposed sentence.
.¶ 92 Likewise, Vandyne v. State, No. 10-07-00328-CR, 2009 WL 1478699 (Tex. App, May 27, 2009) (unpublished opinion), did not analyze the risks that Depo-Provera posed. Although the opinion referred to chemical castration, it did not mention Depo-Provera.
¶ 93 Turning to the majority opinion, it makes much of the decision by Colorado’s legislature to rejeet a “chemical castration” law. But I submit that the legislature’s action in this area means comparatively little to this ease because we really do not know why the legislature rejected the law. See Church of Lukumi Babalu Aye, Inc. v, City of Hialeah, 508 U.S. 520, 558, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (Scalia, J., concurring in part and concurring in the judgment) (“[I]t is virtually impossible to determine the singular ‘motive’ of a collective legislative body, and this Court has a long tradition of refraining from such inquiries.”) (citations omitted),
¶ 94 Í also submit that there is little persuasive force propelling the majority’s statement that the legislature’s decision “de-clin[ing] to authorize chemical castration for persons convicted of criminal offenses” leads to the conclusion that Colorado courts “do not have the authority to order chemical castration as part of the mental health treatment of a civilly committed patient.” The legislature has not passed a statute banning chemical castration; neither our supreme court nor a division of this court have previously offered any 'opinion, either positive or negative, about the practice; and the majority does not point to a decision from another jurisdiction that declares the practice to be unconstitutional.
¶ 95 And I question the utility of the comparison of the process of chemical castration in criminal cases to CJ.R.’s ease. Convicted defendants in criminal cases are, by definition, competent; C.J.R. is not. Convicted defendants have made conscious choices to break the law; C.J,R.’s choices are driven by his mental illness. Chemical castration is ordered for convicted defendants who will live in, the community — not in prison — on probation' or on parole; C.J.R. has been hospitalized for over two decades. Chemical castration may be imposed in a criminal case as a form of punishment; Depo-Provera is used *550 in this case as a form of treatment. In other words, CJ.R.’s behavior poses an entirely different set of questions than the behavior of convicted defendants does.
¶ 96 The majority also submits that my analysis supports the physical castration of patients and that it conjures up “visions of involuntary lobotomies.” But this case is not about either of those irreversible things. And I suggest that the majority’s reference to this parade of horribles introduces into this appeal issues that, akin to the question the majority chooses to raise and to answer sua sponte, are not before us.
, ¶ 97 I also disagree with the majority’s assertion that the use of Depo-Provera in this case is not treatment because its sole purpose would be to moderate CJ.R.’s behavior. Controlling problematic behavior is a form of treatment. For example, one of the reasons that the doctors in Medina wanted to use antipsychotic drugs to treat him was that' he “sometimes [became] assaultive ... and occasionally attacked] others or [threw] furniture and other objects around the mental health facility.” 705 P.2d at 964. The doctors thought that the drugs would “alleviate these symptoms.” Id. A doctor testified that the medication had “decreased the incidents of assaultive behavior.” Id.
¶ 98 C.J.R.’s inappropriate sexual behavior is as much a “symptom” of his disease as Mr. •Medina’s violence was of his. The Depo-Provera that the Institute wants to administer. to C.J.R. is designed to “alleviate” that symptom.
¶ 99 Turning now to the specific analysis of the second Medina factor, I conclude that the record supports the probate court’s determination, by clear and convincing evidence, that Depo-Provera was necessary to prevent C.J.R.’s aggressive and assaultive behavior. The psychiatrist testified that C.J.R.’s sexually inappropriate behavior had escalated since he had been taken off of Clozaril to the point that he represented an ongoing risk of sexual assault to other patients and staff. No other antipsychotic drugs seemed to have worked to mediate his behavior. The psychiatrist recommended Depo-Provera because she thought it could reduce C.J.R.’s libido and thus reduce the sexual assault risk that he posed.
¶ 100 Is a less intrusive treatment alternative available? I also conclude that the record supports the probate court’s determination, by clear and convincing evidence, that there were no less intrusive treatment alternatives available; The psychiatrist had considered and rejected alternatives. She could put C.J.R. in another ward with just men, but she feared that their response to his sexually inappropiiate behavior would be to assault him. He would also pose a risk to the female staff members who worked on the all-male ward. She could isolate him, minimizing his contact with others, but she had tried that solution before, and it did not “work.” She thought the resulting seclusion was more restrictive than the Depo-Provera.
¶ 101 I could, of course,- speculate that there are other alternatives. Perhaps the Institute could, as the majority suggests, “physically restrain [C.J.R.] from touching ... female nurses.” But how would the Institute do that? Would it have to assign a full-time staff member to watch C.J.R. and to restrain him at appropriate times? Would the Institute have to tie him up? I do not know what the Institute’s budgetary considerations are, so I do not know whether it can afford to give C.J.R. a babysitter who, as a result of that assignment, cannot spend time with other patients. And I do not know how C.J.R. would react to’being physically restrained.
¶ 102 I only have before me the psychiatrist’s testimony, and I submit that we should take her at her word. She has treated C.J.R. at the Institute for eight years. She is the expert who understands him, his care, and his reaction to circumstances, such as isolation; she is the expert who knows what the Institute’s staff can do; and she is the expert who can evaluate the risks that C.J.R. presents to others, and the risks that others present to him.
¶ 103 Is the patient’s need for treatment sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment? I conclude that the record supports the probate court’s determination, by clear and convincing evidence, that C.J.R.’s need for treatment with Depo-Prov- *551 era was sufficiently compelling to override his bona fide and legitimate interest in refusing treatment.
¶ 104 The psychiatrist testified that CJ.R.’s behavior had escalated into a dangerous, criminal place. He daily heard voices that instructed him to take off his clothes and to have sex with other people. The psychiatrist’s testimony described the prospect of more sexual assaults on additional people. Such an outcome would not only create problems for those potential victims, but it could also lead to criminal charges being filed against C.J.R. or to other patients assaulting him. And she observed that, historically, he was “quite violent” when the Institute’s staff tried to wean him off of Clozaril. These are certainly compelling circumstances.
¶ 105 I do not minimize Depo-Provera’s significant side effects; it is very strong medicine. But antipsychotic drugs are also very strong medicines that can have significant side effects. As Medina makes clear, there are circumstances in which it is appropriate to administer strong medicines to incompetent patients without their consent.
¶ 106 Antipsychotic medicines affect the human brain, which is the very center of what we perceive, what we think, what we feel, and who we are. I have trouble seeing how Depo-Provera presents a greater risk to C.J.R.’s well-being or to his sense of self than antipsychotic drugs. If courts can grant doctors’ requests to administer antipsychotic drugs to incompetent patients that will directly affect their brains, I do not understand why they cannot, following Medina, grant requests to administer Depo-Provera to those patients that will directly affect their brains or other parts of their bodies. I therefore think that distinguishing between anti-psychotic drugs and Depo-Provera in this case creates a false dichotomy. They are both treatments as far as C.J.R. is concerned, and their use against his will is subject to Medina.
¶ 107 I think that C.J.R.’s desire to avoid the potentially feminizing effects of Depo-Provera is certainly understandable and reasonable. But this case, much like Medina, presents us with one of those choices between unattractive alternatives that the law sometimes requires. I conclude that the probate court chose the “least bad” alternative and that, based on Medina and the record, it was the right choice to make.