2016 CO 4

**The PEOPLE of the State of Colorado, Petitioner,**

v.

**Larry Wayne MARQUARDT, Respondent.**

**Supreme Court Case No. 14SC437**

Supreme Court of Colorado.

January 19, 2016

---

Attorneys for Petitioner: Special Assistant County Attorney, Douglas A. Gradisar, Pueblo, Colorado.

Attorneys for Respondent: The Law Firm of John L. Rice, John L. Rice, Pueblo, Colorado.

CHIEF JUSTICE RICE delivered the Opinion of the Court.

¶1 *People v. Medina,* 705 P.2d 961, 973 (Colo.1985), outlined the rule that courts must follow before ordering a patient to be forcibly medicated. In this case, we hold that the *Medina* rule applies to petitions to increase the dose of a medication over a patient's objection. We also hold that, if the patient is stable, a lack of improvement, without more, does not satisfy *Medina's* requirement that the patient must be at risk of significant and likely long-term deterioration.

## I. Facts and Procedural History

¶2 Larry Wayne Marquardt was committed to the Colorado Mental Health Institute at Pueblo (CMHIP) in 2013 after having been found not guilty by reason of insanity of charges of criminal attempt to commit murder in the first degree, assault with a deadly weapon, and assault on an at-risk adult. Marquardt was diagnosed with "Schizoaffective Disorder, Bipolar Type, with prominent paranoia." He voluntarily took ten milligrams of Saphris, an antipsychotic medication, once per day, but he refused to con-

sent to more than ten milligrams per day. Marquardt refused to take the higher dose based in part on his fear of side effects, especially tardive dyskinesia.[1] The People petitioned the court to allow them to slowly increase the dosage to a maximum of twenty milligrams per day because Marquardt's psychiatrist felt that the ten-milligram dose was only partially effective.

¶3 At the hearing, Marquardt and his psychiatrist, Dr. Howard Fisher, testified. Dr. Fisher described Marquardt's condition, stating that Marquardt had been mentally ill for over thirty years, with symptoms such as hallucinations, delusions, and acts of violence. Dr. Fisher testified that Marquardt's hallucinations had subsided on the ten-milligram dose of Saphris, but that Marquardt still suffered from delusions and an inability to connect the need for medication with his mental illness. As a result, Dr. Fisher concluded that Marquardt's condition would not improve without increasing the dose of Saphris. Dr. Fisher also testified that Saphris was a fairly new drug, but most patients showed few adverse side effects from using it, even at twenty milligrams. He stated that Marquardt had not been a management problem on the unit and had not required the use of emergency medication, restraints, or seclusion. Dr. Fisher noted that Marquardt participated in his group and one-on-one sessions but did not appear to be learning as much as he might from those sessions. Without increasing the dosage, Dr. Fisher doubted Marquardt's ability to improve to the point that he could be discharged from the facility. However, Dr. Fisher also testified, "I can't say that he's going to get worse, at this point. He may be able to hold it together."

¶4 At the conclusion of the hearing, the trial court found that Marquardt was incompetent to participate in treatment decisions. While no recent incidents supported a finding that Marquardt was in danger of causing serious harm to himself or others, the trial court found that "the treatment request

1. Tardive dyskinesia is a potentially permanent side effect of cumulative use of neuroleptic medications, which involves involuntary movements, especially in the lower face. *See People v. Medi-*

*na,* 705 P.2d 961, 965 (Colo.1985); *Tardive Dyskinesia,* Medline Plus, U.S. Nat'l Libr. of Med., NIH, https://www.nlm.nih.gov/medlineplus/ency/article/000685.htm (last updated May 20, 2014).

[was] necessary to prevent a significant long-term deterioration in his mental condition." However, it also found that, although Marquardt was not deteriorating from his current level, he would not improve without a higher medication dose. The trial court observed that, because of Marquardt's mental illness and insanity plea, he would never be released from an institution unless his condition improved. The trial court concluded that Marquardt's need for treatment was sufficiently compelling to override "any bona fide and legitimate interest of [Marquardt] in refusing treatment" and therefore ordered Marquardt to submit to the increased dose.

¶ 5 Marquardt appealed, arguing that the trial court erroneously applied the *Medina* elements to his case. *People ex rel. Marquardt*, 2014 COA 57, —— P.3d ——. The court of appeals held that *Medina* applies not only to initial decisions to forcibly medicate a patient but also to decisions to increase a medication dose over the patient's objections. *Id.* at ¶ 7. The court of appeals also concluded that the trial court applied an incorrect legal standard when it determined that the increased dosage was necessary to prevent a significant and likely long-term deterioration in Marquardt's mental condition. *Id.* The court of appeals reversed the trial court, noting that *Medina* "permits court-ordered medication to prevent long-term deterioration, [but] does not include the ability to order medication solely to improve or expedite a patient's participation in treatment or likelihood of release, however laudable those goals might be." *Id.* at ¶¶ 20, 22.

¶ 6 Judge Casebolt wrote separately. *Id.* at ¶¶ 23–35 (Casebolt, J., dissenting in part). He agreed that the court should apply *Medina* to determine whether a patient must submit to forced medication. *Id.* at ¶ 23. However, he disagreed with the majority's conclusion concerning the "deterioration" element of the *Medina* test. *Id.* He argued that the majority interpreted the deterioration element "in too restrictive a manner

and without sufficient regard for the full test that *Medina* directs." *Id.* He argued that the full test for deterioration—including consideration of the nature and gravity of the patient's illness, whether the medication was essential to effective treatment, the patient's prognosis without medication, and a balancing of the risks associated with medication—allowed the trial court to order medication to improve a patient's condition or enhance his participation in treatment. *Id.* at ¶¶ 24–25.

¶ 7 We granted certiorari to consider whether *Medina* applies to petitions to increase a medication dose over a patient's objection and, if so, whether the trial court correctly applied *Medina* to this case.[2]

## II. Standard of Review

■ ¶ 8 Applying the *Medina* test involves mixed questions of law and fact. *People ex rel. Strodtman*, 293 P.3d 123, 131 (Colo.App.2011) (citing *People v. Bonilla–Barraza*, 209 P.3d 1090, 1094 (Colo.2009)). We defer to the trial court's findings of fact if they are supported by the record, but review the trial court's legal conclusions de novo. *Id.*

## III. Analysis

¶ 9 We begin by holding that the four elements of the *Medina* test must be satisfied before a court may order a patient to submit to a higher dose of medication. *See* 705 P.2d at 973. We then turn to the trial court's application of the *Medina* test in this case. The trial court applied the incorrect legal test when it conflated a lack of improvement with deterioration and ordered Marquardt to submit to a higher dose of antipsychotic medication. We therefore affirm the court of appeals.

### A. The *Medina* Test Applies to Orders to Increase Medication Dosage

■ ¶ 10 First, we agree with the court of appeals that *Medina* applies to orders to

---

2. Specifically, we granted certiorari to review the following issues:

    1. Whether an individual committed to the Colorado Mental Health Institute in Pueblo (CMHIP) by reason of insanity on charges of attempting to murder his mother can

avoid a *Medina* medication order by voluntarily accepting a sub-therapeutic dose of the recommended medication.

    2. Whether the court of appeals erred in finding that the trial court applied an incorrect legal standard.

increase a patient's medication dosage. *Marquardt,* ¶ 7. The *Medina* test strikes the appropriate balance between the patient's right to bodily integrity and the State's interest in protecting the patient and others from harm resulting from the patient's illness. *See Medina,* 705 P.2d at 973. Therefore, *Medina* applies to decisions to increase the dose of medication over a patient's objection as well as decisions to forcibly medicate a patient in the first place.

■ ¶ 11 Generally, a person has the right to bodily integrity, which includes the right "to participate in and make decisions about his own body." *Id.* at 968. This right emerged from the law of battery and developed into the law of informed consent, which requires a patient's consent prior to treatment. *Id.* A physician who treats a patient without the patient's consent commits a battery and is liable for damages, "notwithstanding the exercise of reasonable care in performing" the treatment. *Id.* (quoting *Bloskas v. Murray,* 646 P.2d 907, 914 (Colo. 1982)).

■ ¶ 12 Even though a patient has been involuntarily committed, he does not lose his right to bodily integrity. *See* § 27–65–104, C.R.S. (2015); *Medina,* 705 P.2d at 969–70. Forcibly medicating a patient over his objection is a clear violation of the patient's right to bodily integrity, regardless of his capacity to make a competent decision about his health care. *Medina,* 705 P.2d at 971. "If anything, the state has a greater responsibility toward those who are unable to protect themselves" and should be cautious in overriding a patient's right to refuse treatment. *Id.* We noted in *Medina,* however, that an "involuntarily committed and incompetent" patient's right to refuse treatment is not absolute. *Id.* "The state clearly has a legitimate interest in effectively treating the illnesses of those placed in its charge and, as well, in protecting patients and others from dangerous and potentially destructive conduct within the institution." *Id.*

¶ 13 To balance these interests, a physician who wishes to treat such a patient despite the patient's objections must petition the court for an order to forcibly administer the medication. *See* § 27–65–111(5), C.R.S.

(2015). The physician or facility seeking the order bears the burden to show, by clear and convincing evidence, that the treatment is necessary. § 27–65–111(1). *Medina* created the framework for determining whether a court may order a patient to be forcibly medicated. 705 P.2d at 969–73. Under *Medina,* the physician or facility must show by clear and convincing evidence:

(1) that the patient is incompetent to effectively participate in the treatment decision; (2) that treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient's causing serious harm to himself or others in the institution; (3) that a less intrusive treatment alternative is not available; and (4) that the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.

*Id.* at 973.

¶ 14 The People argue that this test should not apply to a decision to forcibly increase the dose of a medication. But we see no reason why *Medina* should not apply in this case. The decision to increase a medication dose and the decision to medicate in the first instance both require balancing the same interests. Under *Medina,* Marquardt would have the right to refuse to take any amount of Saphris until the physician obtained a court order to force him to take the medication. *See* 705 P.2d at 971. Similarly, he has the right to refuse to take a higher dose of Saphris. However, the State also has a valid interest in treating Marquardt and ensuring that he is not a threat to himself or others. These competing interests are no different than the interests at play when the State initially seeks to medicate a patient over his objection. The test laid out in *Medina* appropriately balances these interests.

¶ 15 Therefore, we see no reason to create a new test for orders to forcibly increase the dose of a medication that a patient is taking voluntarily at a lower dose. *Medina* applies to this case.

## B. The Trial Court Applied the Incorrect Legal Test

¶ 16 We now turn to the trial court's application of *Medina* to this case. The trial court applied the incorrect legal test to conclude that it could order Marquardt to take the increased dose of Saphris. Specifically, it misapplied the second *Medina* factor by relying on evidence that Marquardt was not improving on the lower dose, rather than finding that he was deteriorating.

¶ 17 As noted above, a court may order a patient to accept medication when the physician or facility treating the patient shows by clear and convincing evidence: (1) that the patient is incompetent to participate in treatment decisions; (2) "that treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition" or to prevent a patient from causing serious harm to himself or others; (3) that less intrusive treatment is not available; and (4) that the patient's need for medication outweighs the patient's interest in refusing treatment. *Medina*, 705 P.2d at 973. Only the second element is at issue in this case.

¶ 18 Under the second *Medina* element, the patient must be in danger of either a significant and likely long-term deterioration in his condition or of causing harm to himself or others. *Id.* Here, the trial court found that Marquardt was not a threat to the physical safety of himself or others. Rather, the trial court's order was based on the deterioration element. To determine whether a patient is in danger of long-term deterioration, the court should consider the patient's need for the medication, including "the nature and gravity of the patient's illness, the extent to which the medication is essential to effective treatment, the prognosis without the medication, and whether the failure to medicate will be more harmful to the patient than any risks posed by the medication." *Id.*

¶ 19 The People make two arguments that Marquardt was at risk of significant and likely long-term deterioration: (1) a risk of future deterioration may support a *Medina* order, and (2) *Medina*'s full test for determining when a patient is at risk of significant and likely long-term deterioration allows a trial court to consider a patient's lack of improvement on a lower medication dose. First, they argue that a possibility of future deterioration is sufficient to support a medication order under *Medina*. We disagree. Forcing patients to accept medication based on an abstract, future possibility would render their right to bodily integrity illusory. *See Medina*, 705 P.2d at 974.

¶ 20 In *Medina*, the court held that the State cannot order forced medication based solely on the patient's past violent actions. *Id.* The State's legitimate interest in institutional security is "not sufficient to permit it to expose those committed to its care to the risk of antipsychotic medication solely for the purpose of alleviating the risk of some possibility of future injury or damage to the patient or others." *Id.* Allowing the State to subdue patients based on pure speculation that a patient who was violent in the past may be violent again "would be irreconcilable with the personal dignity of the individual and would render the patient's interest in bodily integrity nothing more than an illusion." *Id.*

¶ 21 This concept—that past violent actions do not create a presumption of future violence—may be applied to the deterioration element as well. A patient's history of mental illness is insufficient to support an assumption that his condition will deteriorate further when he is, in fact, stable. Speculation that the patient might deteriorate in the future, even though he is presently stable, does not override the patient's right to bodily integrity. *See id.* A patient who is stable—neither improving nor deteriorating—is not at risk of additional harm and, therefore, does not require the State's protection from that speculative harm. *See id.* at 971–82. Therefore, the abstract possibility that a patient's condition may deteriorate in the future is insufficient to support a *Medina* order.

¶ 22 Second, the People argue that the trial court's medication order was supported by *Medina*'s full deterioration test, which includes several additional factors that the trial court should consider when determining if the patient is at risk of significant and

likely long-term deterioration. The People argue that the court of appeals relied on a truncated version of the test—focusing only on the word "deterioration"—to overturn the order. *See also Marquardt*, ¶¶ 23, 25 (Casebolt, J., dissenting in part). However the full deterioration test does not alter *Medina*'s requirement that a patient be at risk of significant and likely long-term deterioration. Rather, these additional factors provide guidance that must be viewed through the lens of preventing deterioration.

¶ 23 The factors that make up the full test for determining whether a patient is at risk of a significant and likely long-term deterioration include: (1) the nature and gravity of the patient's illness, (2) the extent to which the medication is essential to effective treatment, (3) the prognosis without treatment, and (4) whether the failure to medicate will be more harmful to the patient than any risks posed by the medication. *Id.* at ¶¶ 24–25 (citing *Medina*, 705 P.2d at 973). All of these factors must be viewed in light of the test's focus—preventing deterioration. For example, the second factor addresses the extent to which the medication is essential to effective treatment. *See Medina*, 705 P.2d at 973. However, what may be considered effective treatment depends on whether the goal is stability or improvement. If the goal were improvement, then the likelihood that Marquardt would remain stable, without showing improvement, would suggest that the lower dose is not an effective treatment. However, because *Medina*'s goal is preventing deterioration, the treatment is effective when the patient is stable.

¶ 24 With the goal of preventing deterioration in mind, the other factors also suggest that a stable patient does not meet the deterioration element. First, the court must consider the nature and gravity of the patient's illness. Viewed in light of preventing deterioration, achieving and maintaining stability in a severely mentally ill patient is an achievement. Next, *Medina* instructs the trial court to consider the patient's prognosis without treatment. *See id.* This factor hinges on the underlying assumption that the goal is stability, not improvement. If the focus were on improvement, Marquardt's prognosis on a lower dose would be bleak. Because the focus is on preventing deterioration, however, Marquardt's stable condition presents a favorable prognosis. A trial court must also weigh the risks of treatment against the risks of failing to treat the patient. *See id.* If the patient is stable on the current dose, then adhering to that dose will not cause additional harm. Therefore, if there is no harm in remaining at a lower dose, then this cannot outweigh the risks associated with increasing the dose. Thus, while these additional factors provide useful guidance to trial courts, they do not expand *Medina*'s fundamental requirement that the medication must be necessary to prevent significant and likely long-term deterioration, nor do they allow a court to order a higher dose based on a patient's lack of improvement.

¶ 25 In this case, the trial court's factual findings do not support its conclusion that Marquardt's condition satisfied the second *Medina* element. The trial court found that there were "no recent incidents which would support the Court making any finding that he is in danger of causing serious harm to himself, or others in the Institution." Thus, the trial court's finding that Marquardt could be forcibly medicated was based only on the risk of deterioration. However, the trial court found that "it doesn't appear that Mr. Marquardt is deteriorating." Instead, it found that the higher dose of Saphris "would increase the quality of his mental condition in a positive fashion" and potentially lead to Marquardt's release from the institution.[3] We defer to the trial court's factual findings that Marquardt was not deteriorating at the lower dose. We conclude, however, that the

---

**3.** The *Medina* court noted that the State's desire to move a patient to a less restrictive environment was insufficient to support a finding that medication would prevent a significant and likely long-term deterioration of the patient's mental condition. 705 P.2d at 975. This case presents a similar situation, where increased medication may positively affect Marquardt's mental health and allow him to move to a less restrictive facility. However, that interest was insufficient to override the patient's right to bodily integrity in *Medina*, and it is similarly inadequate here. *See id.*

trial court erroneously based its order on the positive impact a higher dose of Saphris would have, rather than focusing on whether the higher dose would prevent further deterioration in Marquardt's condition. Thus, the trial court's findings do not support its conclusion that the second *Medina* element was satisfied.

¶ 26 Therefore, because ordering involuntary medication under *Medina* must be based on preventing significant and likely long-term deterioration, not on the hope of improvement, we affirm the court of appeals' holding that the trial court applied the incorrect legal test.

### IV. Conclusion

¶ 27 Courts must apply the *Medina* test before ordering a patient to submit to a higher medication dose over his objections. If a patient is stable on a lower medication dose, and does not present a risk of deterioration, his lack of improvement on the lower dose is insufficient to support a *Medina* order to increase the medication dose. Accordingly, we affirm the court of appeals' holding and remand the case for proceedings consistent with this opinion.