25CA1397 Peo in Interest of Pennington 10-02-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1397
Pueblo County District Court No. 25MH30066
Honorable Amiel Markenson, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of Bobby R. Pennington,

Respondent-Appellant.

---

ORDER AFFIRMED

Division VI
Opinion by JUDGE SULLIVAN
Welling and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 2, 2025

---

Cynthia Mitchell, County Attorney, Kate H. Shafer, Special Assistant County Attorney, Pueblo, Colorado, for Petitioner-Appellee

Tezak Law, P.C., Mary Tezak, Florence, Colorado, for Respondent-Appellant

¶ 1    Respondent, Bobby R. Pennington, appeals the district court's order authorizing the staff at the Colorado Mental Health Hospital in Pueblo (the hospital) to involuntarily medicate him.  We affirm.

## I.    Background

¶ 2    Pennington was committed to the hospital after being found incompetent to proceed in his criminal case.  He was diagnosed with an unspecified mood disorder and presented with symptoms that included agitation, irritability, pressured speech, racing thoughts, and hyper-religious thinking.  Pennington also had a history of self-harming behavior, including thirty suicide attempts, and said that he wanted to take his own life before the cartel could torture him to death.

¶ 3    The hospital started Pennington on emergency medication after he slapped a peer and refused to take his medications for about a week.  He also threatened a staff member, telling her that he would grab her by the hair and slam her head into the wall.  Pennington said that "the voice of God" had instructed him to stop his medications because he needed to be sober in order to engage in "spiritual warfare."  Pennington later said that he refused the medications because they were causing bedwetting and seizures.

¶ 4     In July 2025, the People filed a petition to involuntarily medicate Pennington with olanzapine (Zyprexa), lithium, chlorpromazine (Thorazine), and lamotrigine (Lamictal).  The district court held an evidentiary hearing, at which Pennington and his treating psychiatrist, Dr. Hareesh Pillai, testified.  After hearing the evidence, the court found that Dr. Pillai had testified "credibly and persuasively" and that the People had established all four elements for the involuntary administration of medication under *People v. Medina*, 705 P.2d 961, 973 (Colo. 1985).  The court therefore granted the People's petition.

## II.     Applicable Law and Standard of Review

¶ 5     A district court may order the involuntary administration of medication if the People prove by clear and convincing evidence that (1) the patient is incompetent to effectively participate in the treatment decision; (2) the treatment is necessary to prevent a significant and likely long-term deterioration in the patient's mental health condition or to prevent the likelihood of the patient causing serious harm to themself or others at the institution; (3) a less intrusive treatment alternative isn't available; and (4) the patient's

2

need for treatment is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment. *Id.*

¶ 6 Application of the *Medina* test involves mixed questions of fact and law. *People v. Marquardt*, 2016 CO 4, ¶ 8. We defer to the district court's factual findings if they have record support and review its legal conclusions de novo. *Id.*

¶ 7 When a patient challenges the sufficiency of the evidence supporting an involuntary medication order, we must affirm if the evidence, viewed as a whole and in the light most favorable to the People, is sufficient to support the order. *People in Interest of R.K.L.*, 2016 COA 84, ¶ 13 ("The testimony of the physician seeking to administer treatment may be sufficient by itself to satisfy" the *Medina* elements.). As the fact finder, the district court determines the sufficiency, probative effect, and weight of the evidence, along with the inferences and conclusions to be drawn therefrom. *People in Interest of R.C.*, 2019 COA 99M, ¶ 7.

### III. Analysis

¶ 8 Pennington's sole contention on appeal is that the People presented insufficient evidence to prove the first *Medina* element. We disagree.

¶ 9    Under the first *Medina* element, the district court may not order the forced medication of an involuntarily committed patient unless it is satisfied that the patient's mental illness has so impaired their judgment as to render them incapable of participating in decisions affecting their health. *Medina*, 705 P.2d at 973.

¶ 10   The district court found that Pennington was incompetent to effectively participate in his own treatment decisions. Specifically, the court found that, although Pennington had some "limited insight" into his mental illness, he was still "incapable of making informed treatment decisions" because he didn't "see the need for the medications with his symptoms." The court provided three examples supporting this finding:

1. Pennington refused lithium because he said that it caused bedwetting, but the evidence showed that the bedwetting started before he was given lithium.

2. Pennington said that he stopped taking lithium because he "wanted to hear God's voice" again.

3. Pennington couldn't "make the connection" between his continued requests for an antidepressant (i.e., Effexor) and his increased manic symptoms.

The record supports the court's findings.

¶ 11 Dr. Pillai opined that Pennington had limited insight into his mental illness. Dr. Pillai noted that, on the one hand, Pennington understood that he had been previously diagnosed with major depressive disorder and that his illness caused depression, suicide attempts, and hospitalization. But on the other hand, Pennington did not fully understand the symptoms caused by his unspecified mood disorder, such as irritability, impulsivity, aggression, and delusions.

¶ 12 Dr. Pillai opined that, because of Pennington's mental illness, he couldn't effectively participate in decisions about his treatment. Dr. Pillai noted that there had been "multiple medication changes" since Pennington was initially admitted into the hospital and that there "seem[ed] to be a disagreement about the main symptoms that [were] just trying to be treated." At one point, Pennington requested Effexor, but after starting it, his manic symptoms

worsened.  The staff stopped the antidepressant and, as a result, Pennington became "resistant to working with his provider."

¶ 13    Pennington also refused to take lithium, claiming it caused bedwetting.  But Dr. Pillai testified that bedwetting wasn't a common side effect of lithium.  He also said that he hadn't received any reports of bedwetting while Pennington was on lithium, and in fact the reports of bedwetting started before Pennington began treatment with lithium.  Dr. Pillai noted that Pennington had previously indicated that he refused lithium because it made "God's voice go away," leading Dr. Pillai to conclude that Pennington "wanted to stop the lithium because it was improving some psychotic symptoms."

¶ 14    Notwithstanding this evidence supporting the district court's finding, Pennington asserts that the district court erred because the evidence established that he had a "clear understanding of his own symptoms and how the medications can treat them."  In support, he points to evidence that he asked to restart lithium when he began "suffering intrusive thoughts."

¶ 15    But the record shows that, shortly after Pennington restarted lithium, he again refused it, and when a provider tried to provide

education about lithium, Pennington cursed and threw a cup of water at her. *See People in Interest of Ramsey*, 2023 COA 95, ¶ 45 (evidence that the patient would yell at the provider when she tried to discuss medication supported the finding that the patient was incompetent to effectively participate in treatment decisions). Pennington later refused all medications, including lithium, because the "voice of God" told him to stop taking them.

¶ 16 Pennington next contends that the district court erred by finding that he couldn't make the connection between his use of Effexor and increased manic symptoms. He maintains that his request to resume Effexor was a "perfectly rational and well-reasoned" decision and that Dr. Pillai's concerns with treating his mania only established a "difference in priorities." Again, the record shows otherwise.

¶ 17 Dr. Pillai testified that, when Pennington was initially admitted to the hospital, his provider "agreed to trial him on Effexor" based on his "complaints and his request to be started on that medication." But when the Effexor was increased to a "more therapeutic level," Pennington "began having worsening symptoms of mania." Dr. Pillai opined that the "combination of lithium and

7

lamotrigine" would "target some of those depressive type symptoms," given the "symptoms of paranoia and delusions contributing to these types of depressive symptoms."

¶ 18    In contrast, Pennington believed that the hospital stopped providing him with Effexor because he refused to attend group therapy. When specifically asked whether he recognized a connection between the Effexor and increased manic symptoms, Pennington answered, "not at all" and that "[i]t was the exact opposite."

¶ 19    Therefore, the record supports the district court's finding that Pennington couldn't recognize the connection between his use of Effexor and increased manic symptoms. The record also belies Pennington's assertion that his continued request for Effexor was merely a "difference in priorities" between him and Dr. Pillai. *See People in Interest of Strodtman*, 293 P.3d 123, 132 (Colo. App. 2011) (a patient must demonstrate more than the ability to "articulate his or her preferences"; rather, "[t]o participate effectively contemplates action in addition to words").

¶ 20    In sum, given the evidence supporting Pennington's limited insight into his need for the requested medications and the severity

of his illness, in combination with the weight the district court placed on Dr. Pillai's credibility, we can't conclude that insufficient evidence supported the court's determination that Pennington is incompetent to effectively participate in the relevant treatment decision. *See People in Interest of D.N.W.*, 2024 COA 129, ¶ 20 (deferring to the court's determination of witness credibility and the weight afforded that testimony).

## IV. Disposition

¶ 21 We affirm the order.

JUDGE WELLING and JUDGE GOMEZ concur.