25CA2026 Peo in Interest of AR 03-12-2026

COLORADO COURT OF APPEALS
_____

Court of Appeals No. 25CA2026
City and County of Denver Probate Court No. 25MH937
Honorable Beth A. Tomerlin, Magistrate
_____

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of A.R.,

Respondent-Appellant.
_____

ORDER AFFIRMED

Division II
Opinion by JUDGE KUHN
Fox and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 12, 2026
_____

Miko Brown, City Attorney, Daniel Horwitz, Assistant City Attorney, Denver, Colorado, for Petitioner-Appellee

Richard Slosman, Boulder, Colorado, for Respondent-Appellant

¶ 1    A.R. appeals the probate court's order authorizing the involuntary administration of medications to her.  We affirm.

## I.    Background

¶ 2    In March 2025, A.R. was deemed incompetent to proceed in a criminal case.  The district court committed her to the custody of the Colorado Department of Human Services for a competency evaluation or restoration services.  A Denver Health Medical Center psychiatrist, Dr. James Haug, treated A.R. at the jail while she awaited placement at a competency restoration facility.

¶ 3    In September 2025, Denver Health filed a petition for authorization to administer antipsychotic, mood-stabilizing, anxiolytic, and side-effect medications to A.R. without her consent.[1]  According to the petition, A.R. requires treatment for her schizoaffective disorder, bipolar type, with manic symptoms.  The petition detailed A.R.'s deterioration at the jail, most notably that her body weight had dropped from 140 pounds to 96 pounds due to

---

[1] Specifically, the petition sought permission to involuntarily administer Haldol, Risperdal, Zyprexa, Depakote/Depakene, lithium, Ativan, Benadryl, and Cogentin, along with their long-acting counterparts where appropriate.  The petition also sought permission to conduct lab testing.

her refusal to eat consistently, her demands for particular types of foods, and her recent belief that the food is laced with arsenic. The petition also described A.R.'s manic symptoms, including yelling and swearing at jail and Denver Health personnel and expressing paranoia that jail deputies are trying to sexually assault her. The petition also reported that A.R. had stopped wearing clothing altogether.

¶ 4     At the hearing on the petition, Dr. Haug and A.R. both testified. Dr. Haug, whom the parties stipulated was an expert in psychiatry, testified that A.R.'s schizoaffective disorder — which he described as "severe" — constitutes a substantial disorder that impairs her judgment, her capacity to recognize reality, and her ability to control her behavior. He reported that A.R.'s physical condition was "fairly concerning" and that if she continues to not eat, she will die of starvation. He also testified that "it's become clear" that A.R.'s refusal to eat is caused by her mental illness, not just having very particular food preferences. He further testified that A.R. remaining in a state of mania long term will damage her brain, which will make it more difficult to treat her and lead to a lower baseline of functioning following treatment.

¶ 5     Dr. Haug opined that medication is a "hundred percent" essential to effectively treat A.R.'s condition and that without the requested medications, she is at risk of significant and likely long-term deterioration of both her physical and mental condition. However, when Dr. Haug attempted to discuss the medications with A.R., "[s]he aggressively told [him] she doesn't need medications and flipped [him] off." Dr. Haug also mentioned that A.R. had been treated with Geodon and lithium during a 2021 hospitalization at Denver Health, and although lithium was one of the medications he was requesting, he was not requesting Geodon because it must be taken orally with at least 350 calories, but she was not eating food.

¶ 6     A.R. testified that she did not agree with any of Dr. Haug's testimony, including his schizoaffective disorder diagnosis, but then said that she agreed with a previous diagnosis that she is "autistic, also schizophrenic with also full body disability." On cross-examination, she was asked what treatment she was receiving for her schizophrenia, and she responded, "the greatest treatment that I need is actually nutritional, and I need food before we can continue with anything else. And I absolutely refuse treatment from Denver Health." She testified that she has particular food

requirements because of severe indigestion, the food she has been served is "adulterated" because it is "spoiled rotten," and she "need[s] to gain at least [ten] to [twenty] pounds before medications can safely be considered." As for medications, she testified that she was only willing to take "very minimal[]" amounts of Geodon and lithium.

¶ 7 However, Dr. Haug testified that giving A.R. only small amounts of Geodon and lithium, and only after she increases her weight, "would not be a successful strategy," and instead would "be a dangerous strategy," because (1) it has been impossible to accommodate her dietary requests, which are driven by her manic symptoms; and (2) it would encourage her not to gain weight so she won't have to take medication.

¶ 8 After hearing the testimony, the probate court found that Dr. Haug's testimony was credible and that A.R.'s testimony was not credible. The court examined each of the four elements of the test from *People v. Medina*, 705 P.2d 961, 973 (Colo. 1985), concluded that Denver Health had met its burden of proving all four elements, and granted the petition.

## II. Analysis

¶ 9 The parties agree that the *Medina* test applies in this case.[2] However, A.R. contends that the evidence was insufficient to prove any of the four *Medina* elements.

### A. Applicable Law and Standard of Review

¶ 10 Under the *Medina* test, a court may authorize the involuntary administration of medication if the petitioner demonstrates by clear and convincing evidence that

(1) the patient is incompetent to effectively participate in the treatment decision;

(2) the treatment is necessary to prevent a significant and likely long-term deterioration in the patient's mental health condition or to prevent the likelihood of the patient causing serious harm to herself or others at the institution;

(3) a less intrusive treatment alternative is not available; and

---

[2] When the state seeks an order authorizing involuntary administration of medication solely to restore a defendant to competency to stand trial, a court must apply the test set forth in *Sell v. United States*, 539 U.S. 166, 180-81 (2003). But "if forced medication is warranted for a different purpose, . . . related to the individual's own interests," then applying state-law tests, which account for those purposes, is preferred. *Id.* at 182. We agree with the parties that the *Medina* test applies to this order.

(4) the patient's need for treatment is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.

*Id.*

¶ 11    Application of the *Medina* test involves mixed questions of fact and law. *People v. Marquardt*, 2016 CO 4, ¶ 8. We defer to the probate court's factual findings if they have record support, but we review de novo the court's legal conclusions. *Id.* Resolving conflicts in the testimony and determining the credibility of the witnesses are matters solely within the province of the probate court. *People in Interest of Ramsey*, 2023 COA 95, ¶ 23.

¶ 12    In a sufficiency challenge, we must determine whether the evidence, viewed as a whole and in the light most favorable to the petitioner, is sufficient to support the probate court's order. *People in Interest of R.K.L.*, 2016 COA 84, ¶ 13. The testimony of the physician seeking to administer treatment may be sufficient, without more, to satisfy the *Medina* test. *Id.* at ¶ 30.

        B.    Incompetency to Make Treatment Decisions

¶ 13    The first *Medina* element requires the petitioner to establish "the patient's incompetency to make treatment decisions." *Id.* at

¶ 32 (quoting *Medina*, 705 P.2d at 973). For the petitioner to prevail, the probate court must be satisfied that "the patient's mental illness has so impaired [her] judgment as to render [her] 'incapable of participating in decisions affecting [her] health.'" *People in Interest of Strodtman*, 293 P.3d 123, 132 (Colo. App. 2011) (quoting *Medina*, 705 P.2d at 973).

¶ 14 The probate court found that A.R. is incompetent to effectively participate in treatment decisions because of her delusions and paranoia, which lead to "endless" demands and bargaining about food and medications. The court also pointed out that "[A.R.'s] testimony is that she'll only take medications that are . . . at her direction and her decision. That's not informed conversation with a medical doctor trained in psychiatry about a condition and what would alleviate symptoms of that condition or help someone to function better."

¶ 15 Those findings are well supported by Dr. Haug's testimony. Dr. Haug opined that A.R. is incompetent to effectively participate in treatment decisions, explaining that A.R. "does not believe any of her behavior currently is related to mental illness." A.R. appeared to confirm that position during her testimony when she denied

having a mood disorder and instead blamed her behavior on "the effects of starvation." Further, Dr. Haug testified that he has not been able to communicate with A.R. recently because she has either "not [been] responding to [him]" or she has been "flipping [him] off and yelling." Refusing to communicate with a treatment provider does not enable effective participation in treatment decisions.

¶ 16 A.R. argues that she is competent to effectively participate in treatment decisions because "she recognized the need to take Geodon and lithium" and was willing to do so "as her weight increase[s] to a safe measure." But that argument somewhat mischaracterizes A.R.'s testimony at the hearing. She testified that she was "willing to accept small amounts of Geodon and lithium only, but that is after I gain at least [ten] to [twenty] pounds *and an evaluation is done after that, if it's still needed.*" (Emphasis added.) Further, when she was asked about treating her schizophrenia, she responded that "the greatest treatment that I need is actually nutritional."

¶ 17 Dr. Haug opined that taking a small amount of Geodon and lithium only after A.R. increases her weight would not be successful and would in fact be a dangerous strategy. Further, Dr. Haug

8

opined that A.R.'s untreated schizoaffective disorder is what led to her behaviors and beliefs surrounding food, which led to her extreme weight loss. He testified that this calls into serious question how A.R. would be able to gain ten to twenty pounds while continuing to go untreated. As noted above, the probate court found Dr. Haug's testimony on all of these points credible. *See Ramsey*, ¶ 23.

### C.  Lont-Term Mental Deterioration or Likelihood of Harm

¶ 18    The probate court also found that the requested medications were necessary both (1) "to prevent a significant and likely long-term deterioration in [A.R.'s] mental condition" and (2) "to prevent the likelihood of [A.R.] causing serious harm to herself in the institution because she's starving herself to death, and that is a direct result of the psychosis and her mental condition."

¶ 19    Those findings are also well supported by Dr. Haug's testimony. As described above, he testified that A.R. continuing to be in a state of mania long term will damage her brain and lead to a lower baseline of functioning. And he opined that A.R.'s untreated

9

schizoaffective disorder jeopardized not only her health but her life itself.

¶ 20 A.R. asserts that she "was working with jail staff to gain weight" and argues that taking Geodon will encourage further weight gain because it must be taken with 350 calories. But we see *no* evidence in the record supporting this assertion. To the contrary, the record indicates that she weighed ninety-six pounds on the date the petition was filed, but at the hearing six days later, A.R. reported that she currently weighs ninety-*two* pounds. The probate court's findings, which are well supported by Dr. Haug's testimony, indicate that the requested medications are necessary to reverse the deterioration in A.R.'s physical and mental health.

### D. No Less Intrusive Alternative

¶ 21 A.R. contends that there was an appropriate, less intrusive alternative to the requested medications, namely, giving A.R. "appropriate, unspoiled and healthy food" and "Geodon and a low dosage of lithium when she [reaches] a safe weight."

¶ 22 We have already addressed and rejected A.R.'s arguments regarding treating her with a small amount of Geodon and lithium, *supra* Part II.C. In terms of A.R.'s argument about "appropriate,

unspoiled and healthy food," the probate court specifically addressed that issue. The court said that her belief that the food is rotten is evidence that she can't recognize reality and that she has impaired cognition and thought processes. The court also noted the evidence that A.R. refused to eat if her precise demands were not met, one of which was being given exactly four salt packets and four pepper packets with her meal. The court then found that "these demands . . . can never be met because it's an endless cycle of demands. It's not enough. It's not good enough. . . . [A.R.'s] mental illness drives this, that she has no apparent control over these . . . demands or how she feels at this point." Dr. Haug's testimony amply supports the court's findings on these points. He testified that while the jail staff had gone to extreme lengths to accommodate A.R.'s demands, those demands had continued to change, and she continued to not eat.

### E. Need for Medication Overrides Legitimate Reason to Refuse

¶ 23     In analyzing the fourth *Medina* element, a court first determines "whether the patient's refusal [of treatment] is bona fide and legitimate." *Medina*, 705 P.2d at 974. If it is, the court then

determines "whether the prognosis without treatment is so unfavorable that the patient's personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient placed in its charge and in protecting the safety of those in the institution." *Id.*

¶ 24   A.R. argues that "[s]he has had experiences with some [of the requested] medications and has experienced significant side-effects." However, she did not cite any part of the record to support that argument, *see* C.A.R. 28(a)(7)(B), and we find no record support for it. However, Dr. Haug was specifically asked whether A.R. had ever been treated with the requested antipsychotic, mood-stabilizing, and anxiolytic medications. In terms of the three antipsychotic medications, Dr. Haug testified that A.R. had previously been treated at Denver Health with Zyprexa and Haldol and there was no comment in the medical records that she experienced any side effects from them. In terms of the two mood-stabilizing medications being requested, Dr. Haug testified that he would begin treating her with lithium because she has taken it previously and "tolerated it well." And in terms of the anxiolytic medication Ativan, Dr. Haug testified that it "has the fewest side

12

effects of any of those other medications" and "works the fastest," that A.R. had previously been treated at Denver Health with it, and "[t]here was no note [in the medical records] that she experienced any issues with [it]."

¶ 25    A.R. also argues that she "is legitimately concerned that without first gaining weight, the risks from these medications are increased, and that the involuntary medications requested would be detrimental to her."  But the probate court did not find A.R.'s testimony to be credible, and Dr. Haug, whose testimony the court did credit, did not express concerns during his testimony regarding A.R. taking the requested medications at her current weight.

¶ 26    We therefore cannot conclude that A.R.'s arguments on appeal reveal any bona fide and legitimate reason for refusing the requested medications.  And the probate court found that "[A.R.'s] mental deterioration is such, at this point, . . . that she's unable to actually express [a] bona fide and legitimate interest in refusing treatment because her deterioration is such that she can't really distinguish between reality and fantasy-induced psychosis."  In any event, the probate court's findings and Dr. Haug's testimony establish that the severity of A.R.'s condition and her compelling

need for the requested treatment override any bona fide and legitimate interest she has in refusing treatment.

¶ 27 Given all of this, we conclude that the evidence, viewed as a whole and in the light most favorable to the petitioner, is sufficient to support the probate court's order. *See R.K.L.*, ¶ 13.

### III.   Disposition

¶ 28 The order is affirmed.

JUDGE FOX and JUDGE SULLIVAN concur.